# MOORE v. SHARP.

(*Nashville.* · February 17, 1897.)

1. ELECTIONS. *Legislative power to require registration.*

The Legislature has the power to pass an act prohibiting any registered voter from voting at any election after changing his residence by removing to another, either within or without the ward or district where he has registered, unless he re-registers at least twenty days before the election. (*Post, pp. 495–499.*)

Cases cited and approved: 12 Pickering, 485; 16 Mich., 342; 38 Mo., 425; 21 Wis., 566.

2. SAME. *Change of residence disqualifies voter, when.*

Change of residence by a registered voter, either within or without the ward or district where registered, disqualifies him to vote, unless he shall re-register at his new residence as much as twenty days before the election. (*Post, pp. 495–499.*)

Act construed: Acts 1895, Ch. 3 (Ex. Ses.).

3. SAME. *Voter not compelled to disclose for whom he voted.* ·

Neither legal nor illegal voters can be compelled to testify for whom they voted in a contest over the election. (*Post, pp. 499–501.*)

4. SAME. *Evidence of illegality of votes.*

But it is competent to prove for what candidate a voter cast his ballot by his declaration of intent on or before voting, his expressions of sympathy or promise of support, his political associations and affiliations, his conduct at the polls, and other circumstances indicating his choice. (*Post, p. 501.*)

5. SAME. *Voter's declarations after election.*

The voter's declarations as to how he voted, made after the election, are hearsay, and not competent evidence upon that issue. (*Post, p. 501.*)

---

Moore *v.* Sharp.

---

6. SAME. *Rule as to deduction of illegal votes.*

Where the evidence shows that illegal votes were cast, but not for whom they were cast, they should be deducted from the vote of each candidate in the proportion which that vote bears to the entire vote polled at the precinct where the illegal votes were cast. (*Post, pp. 501–503.*)

Cases cited: 9 Mont., 497 (S. C., 18 Am. St. Rep., 761).

7. SAME. *Ballot marked for other than disabled voter, void.*

Unless the voter is unable, from blindness or other physical disability, to mark his ballot, he is not entitled to the assistance of the officer holding the election; and the ballot of other than such disabled voter, marked by the assistance of the officer of election, or of any other person, is illegal, and must be rejected. (*Post, pp. 503, 504.*)

Act construed: Acts 1890, Ch. 24 (Ex. Ses.).

8. SAME. *Blind voter's ballot illegally marked not void, when.*

But the ballot of a blind voter cannot be rejected as illegal where, without his fault, it was marked by an unauthorized person, and he cast it believing the ballot had been legally marked. (*Post, p. 504.*)

Act construed: Acts 1890, Ch. 24 (Ex. Ses.).

9. SAME. *Assistance rendered blind and physically disabled voter, though illiterate.*

That a voter can neither read or write does not deprive him of the right to have the officer's assistance in marking his ballot, if he is blind or otherwise physically disabled to mark it. (*Post, pp. 505, 506.*)

Act construed: Acts 1890, Ch. 24 (Ex. Ses.).

Case cited and approved: Cook *v.* State, 90 Tenn., 407.

10. SAME. *Appointment of special deputies condemned.*

The appointment by the Sheriff of special deputies for an election at which he is a candidate for re-election, though made under legal advice, is without warrant of law and absolutely void, and confers no authority whatever upon the deputies. (*Post, pp. 507–510.*)

Code construed: § 1178 (S.); § 1044 (M. & V.); § 839 (T. & S.).

Act construed: Acts 1890, Ch. 24 (Ex. Ses.).

Moore *v.* Sharp.

11. SAME. *Evidence of intimidation of voter insufficient, when.*

The evidence fails to sustain the charge that certain persons were unlawfully kept from casting their ballots where there is no proof that such persons did not, in fact, vote, and the poll lists show that persons of the same name did vote. (*Post, pp. 510, 511.*)

12. SAME. *Voter not illegally deprived of right, when.*

A candidate for office is not entitled to a credit for one intending to vote for him, who did not vote at the election merely because one holding the poll tax receipt of such voter was improperly arrested, where he was released before the polls were closed, and the voter did not need a poll tax receipt to entitle him to vote, as he had just attained his majority, and was also disfranchised because he had changed his residence after registering, and failed to re-register. (*Post, pp. 511, 512.*)

13. SAME. *Specific pleading required.*

An illegal vote should not be charged to the contestant of an election, although the evidence shows that it was cast for him, where there is no pleading to make an issue on such vote. (*Post, pp. 513, 514, 517, 518.*)

14. SAME. *Evidence insufficient to show for whom ballot was cast.*

Evidence that the political associations of certain voters were with men belonging to the political party to which a specified candidate for Sheriff belonged, is insufficient, alone and of itself, to show that they voted for such candidate. (*Post, pp. 514, 515.*)

15. SAME. *Pleadings of one party sufficient to raise issue.*

A contestant of an election who attacks the returns from a given district on the ground that one ballot was marked for a person who was not physically disabled, which was counted for contestee and not certified as required by the statute, is properly charged with such ballot where it was cast for him instead of the contestee, although the latter did not attack the returns of such district in any manner. (*Post, pp. 516–518.*)

16. SAME. *Insufficient release from poll tax.*

A resolution passed by the County Court exempting from poll tax all inmates then in the county asylum, will not authorize inmates of such asylum, two years later, to vote without payment of a poll tax, at least without showing that they were inmates at the time the resolution was passed, under

Shannon's Code, § 687, providing that any person incapable of labor, wishing to have himself declared exempt from poll tax, shall apply to the County Court by "petition," stating the ground of his claim therefor, and if the Court is satisfied of his inability to labor, it shall declare him so of record, and the production of a copy of the same, duly authenticated, shall be authority for omitting to collect the poll tax. (*Post, pp. 523, 524.*)

Code construed: § 687 (S.); § 599 (M. & V.); § 540 (T. & S.).

FROM DAVIDSON.

Appeal in error from Circuit Court of Davidson County. J. W. BONNER, J.

J. H. ACKLEN, SMITH & MADDIN, GRANBERY & MARKS, and M. W. ALLEN for Moore.

BARTHELL & KEEBLE, JOHN ALLISON, and HAMILTON PARKS for Sharp.

McALISTER, J. This record presents a contest for the office of Sheriff of Davidson County. The investigation in the Court below assumed a very wide range, presenting directly or remotely nearly every feature of our election laws; the result is a record of almost unprecedented volume. While the case is to be tried in this Court as an equity case, *de novo* wherein the findings of the Circuit Judge on questions of fact are not conclusive, our investigations must necessarily be confined to the assignments of error.

Moore and Sharp were opposing candidates for the office of Sheriff at the general election held August 6, 1896. Sharp being the incumbent of the office was thereby disqualified to hold the election, and, in consequence of this fact, it was conducted by the Coroner, who returned the following vote: Sharp, 5,282; Moore, 5,276; Cockrill, 167; said tabulation showing a plurality in favor of Sharp of six votes. Sharp was accordingly awarded the certificate of election and inducted into office. In a short time thereafter Moore filed his petition in the Circuit Court of Davidson County, contesting the validity of said election, and seeking to establish his title to the office, setting forth specifically the grounds of his contest. An answer and cross petition were filed by Sharp, in which the allegations of the original petition were denied, and countercharges of fraud and illegal voting on the part of the supporters of the contestant were preferred. The Circuit Judge, after a most patient hearing and investigation of the case, extending over several weeks, and after purging the polls of illegal ballots, and recasting the vote upon the issues made in the pleadings and upon the proof, returned the following tabulated vote: Sharp, 5,179.36; Moore, 5,168.62; showing a plurality in favor of Sharp over his closest competitor of ten votes. Moore appealed and has assigned errors.

The first assignment of error is, that the Court erred in holding and decreeing that if a person changes his residence within the ward or district

after registration closes, he thereby loses his vote. Contestant claims that, under this erroneous ruling, he was deprived of ten votes by the Circuit Judge in recasting the vote.

The ruling of the Circuit Judge was, that a voter changing his residence in the same ward or district within twenty days before the election was not entitled to vote, and such we think are the plain provisions of the statutes.

Section 5, Ch. 3, Acts 1895, Ex. Ses., provides, viz.: ''All persons who shall have registered under the provisions of this article and hereafter change their residence by removing to another, either within or without the ward or district where registered, shall not be qualified to vote in any election thereafter held without first having reregistered, under the provisions of this article, as much as twenty days previous to any election where he offers to vote, and the registrars in such case shall take up and cancel the certificate formerly issued to such voter, unless the same has been lost or destroyed.'' Shannon's Code, § 1200.

The next section of this Act provides that the registration books shall be opened for at least three days continuously, previous to any election, for the purpose of registering such voters as have not already been registered, and to re-register those who have changed their residence, but the books shall be closed twenty days previous to said election. Acts 1895, Ex. Ses., Ch. 3, Sec. 6; Shannon's Code, § 1201.

Moore *v.* Sharp.

It is insisted in argument that the registration laws were intended to identify voters at a particular residence, and to prevent repeating, and nonresidents of wards or districts from voting; that, when registration closes, twenty days before election, each qualified voter is identified at a particular place of residence, and he may remove as many times as he may desire between the close of registration and the day of election and will not lose his right to vote, provided no other provisions of the election laws are violated. It is insisted that none of the evils can possibly arise by such a removal which the registration laws were intended to prevent.

Counsel then conclude their argument on this subject in the following language, to wit: "If the Courts can deprive a voter of the right of suffrage because he has moved his residence in the same ward or district after registration, it gives the Courts the power to prescribe an additional qualification which is not prescribed by the statute." Counsel are reminded that the disqualification of the voter who removes from his ward or district after registration is closed, is not fixed by the Courts, but by the plain letter of the statute, which declares that all such persons are not qualified without a new registration for at least twenty days preceding the election.

"If voters choose to disregard the mandates of the law, they disfranchise themselves, and neither Courts of justice entertaining contests over an elec-

14 P—32

tion nor election officers declining to receive such votes can be accused of any disfranchisement of the voter who has lost his right by his own disregard of the law." *Louck's Case*, 3 Dist. Rep., 127 (13 Penn. Co. Ct. Rep., 205).

That the legislature has power to pass such an Act, we think may not now be seriously questioned. Mr. Cooley, in his work on Const. Lim., at page 601, gives a very clear exposition of the objects and purposes of such legislation. Says this author: "In some of the States it has also been regarded as important that lists of voters should be prepared before the day of election, in which should be registered the names of every person entitled to vote. Under such a regulation the officers whose duty it is to administer the election laws are enabled to proceed with more deliberation in the discharge of their duties and to avoid the haste and confusion that must attend the determination upon election day of the various and sometimes difficult questions concerning the right of individuals to exercise this important franchise. Electors, also, by means of this registry, are notified in advance what persons claim the right to vote and are enabled to make the necessary examination to determine whether the claim is well founded and to exercise the right of challenge if satisfied any person registered is unqualified. When the Constitution has established no such rule and is entirely silent on the subject, it has sometimes been claimed that the statute requiring voters

to be registered before the day of election and ex-
cluding from the right all whose names do not ap-
pear upon the list, was unconstitutional and void as
adding another test to the qualifications of electors
which the Constitution has prescribed, and as having
the effect, where electors are not registered, to ex-
clude from voting persons who have an absolute
right to that franchise by the fundamental law.
This position, however, has not been accepted as
sound by the Courts. The provision for a registry
deprives no one of his right, but is only a reason-
able regulation under which the right may be exer-
cised. Such regulations," says the author, "must
always have been within the power of the legisla-
ture unless forbidden," citing *Capen* v. *Foster*, 12
Pickering, 485; *People* v. *Kopplekom*, 16 Mich., 342;
*State* v. *Bond*, 38 Mo., 425; *State* v. *Hilmantel*,
21 Wis., 566.

These observations of Mr. Cooley are apposite in
the present instance, for if the Legislature had a
right to enact a registration law, which is unques-
tionable, it was equally authorized to declare that an
elector, changing his place of residence from or
within his ward or district, after registration, should
not be qualified to vote without a new registration,
at least twenty days before the election. So that
we entirely agree with the Circuit Judge in his
ruling on this subject, and this assignment of error
is overruled.

The second assignment of error is, that the Court

was in error in declining to deduct illegal votes from the entire votes polled, in cases where it could not be determined, from the evidence, for whom such illegal votes were cast. This assignment of error is based upon the following state of fact: The Circuit Judge ruled, in accordance as we think with the weight of authority, that the voter could not be compelled to disclose for whom he voted, that the secrecy of the ballot was inviolable, and that this immunity applied as well to legal as to illegal voters, though the exemption in the two instances rested on different grounds. The illegal voter would be excused upon the ground that such a disclosure would tend to incriminate him.

Says Mr. Greenleaf: "Where it reasonably appears that the answer will have a tendency to expose the witness to a penal liability, or to any kind of punishment, or to a criminal charge, he will be excused. And he may claim the protection at any stage of the inquiry, whether he has already answered the question in part or not at all. If the fact to which he is interrogated forms but one link in the chain of testimony which is to convict him, he is protected, and whether it may tend to criminate or expose the witness is a point upon which the Court is bound to instruct him, and which the Court will determine under all the circumstances of the case, but without requiring the witness fully to explain how he might be criminated by the answer which the truth would oblige him to give. For if

he were obliged to show how the effect would be produced, the protection which this rule of law is designed to afford him would at once be annihilated. But the Court will not prevent the witness from answering if he chooses; it will only advertise him of his right to decline it." So that we concur in the ruling of the Circuit Judge that neither legal nor illegal voters may be compelled to disclose their ballots.

"It is well settled, however, that in the absence of the voter's own statement, his vote may be proved either by direct or circumstantial evidence. His declaration of intent on or before voting, his expression of sympathy or promise of support, his political associations or affiliations, his conduct at the polls, and other circumstances indicating his choice, may be proven." Paine on Elections, 768; McCrary on Elections, 458. "Declarations of the voter, however, after the election, as to how he voted, come within the classification of hearsay evidence, and are incompetent."

On the trial below it was developed that illegal votes were polled, but it was impossible to ascertain for whom they were cast. The question then arose in respect of the disposition of such illegal votes, whether they should be deducted from the vote of the candidate having the largest plurality or apportioned among the respective candidates, and, if so, what rule of apportionment should be observed. Mr. Paine favors the rule of excluding the poll alto-

gether when it cannot be ascertained for whom the illegal votes were cast. This author says this rule is safer than the rule which arbitrarily apportions the fraud among the parties.

The Law of Elections, Sec. 513 (Mr. McCrary), however, lays down this rule: " If an illegal voter, when called as a witness, swears he does not know for whom he voted, and it is impossible to determine from any evidence in the case for whom he voted, his vote is not to be taken from the majority. But it does not follow that such illegal votes must necessarily be counted in making up the true result, because it cannot be ascertained for whom they were cast. In purging the polls of illegal votes, the general rule is, that unless it be shown for which candidate they were cast, they are to be deducted from the whole vote of the election division, and not from the candidate having the largest number. - Of course, in the application of this rule, such illegal votes would be deducted proportionately from both candidates, according to the entire vote returned for each." McCrary on Elections, Sec. 460.

This rule was approved by the Supreme Court of Montana in the recent case of *Heyfron* v. *Mahoney*, 9 Mont., 497 (18 Am. St. Rep., 761), viz.: "That illegal votes, not shown for whom cast, should be deducted from the vote of each candidate at that particular precinct in the proportion that the vote of each candidate bears to the whole vote cast at that precinct."

We find in the opinion of the Circuit Judge a statement by him that counsel on both sides agreed to the Montana rule as the one applicable in this case. It is stated in the assignment of errors that the Court ruled that no apportionment of votes shown to be illegal can be made when no proof except illegality is offered, but counsel are in error in this assumption, since the Circuit Judge, in announcing the rule of law by which he would be governed in recasting the vote, said: "If, however, it cannot be shown for whom they (the illegal votes) were cast, they must be deducted from the vote of each candidate in the proportion which that vote bears to the entire vote polled at that precinct. Necessarily," continues the Court, "the computation will sometimes bring fractional results, but this does not mean that a candidate can be chosen by a fraction of a vote. The fractions are of value in making up the totals, but will be discarded in announcing results after a balance has been struck."

The third assignment is that the Court erred in not holding and decreeing those votes illegal where the ballots were marked by any person other than the voter himself or the officer holding the election. This assignment of error involves the proper construction of Sec. 16 of what is commonly known as the Dortch Election Law, which provides, viz.: "That any voter who declares to the officer holding the election that, by reason of blindness or other physical disability, he is unable to mark his ballot, shall,

upon request, receive the assistance of the officer holding the election in the marking thereof, and such officer shall certify on the outside that it was so marked with his assistance, and shall give no information in regard to same." The Circuit Judge held, under this section, "that any ballot marked for a person neither blind nor physically disabled, is void, whether marked by the Deputy Sheriff or Coroner, a Judge, Clerk, receiver, registrar, or any other person." He further held that the Deputy Coroner or Sheriff holding the election is the only person who can lawfully mark ballots for persons blind or otherwise physically disabled from marking their own ballot.

The Court held further that, while a blind man is presumed to know the law, yet he cannot be expected to always recognize the distinction between persons officiating at the polls. Hence, if a blind man, in good faith, and believing he is submitting his case to the proper officer, blamelessly allows his ballot to be marked by some other person, it should not be rejected. The assignment of error under consideration is that those votes are illegal where the ballots are marked by any person other than the voter himself or the officer holding the election. This is precisely what the Circuit Judge held, with this qualification, that if a blind man, without fault on his part, allows his ballot to be marked by an unauthorized person, believing him to be the officer holding the election, his ballot is not thereby rendered void. In this ruling there was no error.

The fourth assignment is, that the Court erred in not holding and decreeing votes illegal where the ballots were marked for illiterates, who declared themselves physically disabled, · but whose physical disability would not alone have prevented them from marking their own ballots.

The fifth assignment is, that the Court erred in not holding and decreeing those votes illegal where the ballots were marked for illiterates, who, though physically disabled, yet could not mark their own ballots if physically sound.    These assignments present cognate questions, and will be considered together.

It will be perceived that the idea underlying both assignments of error is that the Dortch law was designed to require an educational qualification as a prerequisite to voting.   "The statute provides that any voter who declares that by reason of blindness or other physical disability he is unable to mark his ballot," etc.   It is argued that this language implies that the voter must in all respects other than that of physical disability, including an educational qualification, be able to mark his ballot, and that the provision of Section 18  "that a voter who shall make a false statement as to his inability to mark his ballot shall be punished," etc., adds additional weight to this circumstance.   It is admitted there is no expressed educational qualification in the Act, but it is insisted that the capacity to read and write is undoubtedly required by implication, otherwise the voter, by physical disability, real or pretended, could

accomplish through another what he could not do personally if physically sound. There is much plausibility in the position thus assumed, but we understand the precise question to have been decided otherwise by this Court. In *Cook* v. *The State*, 90 Tenn., it was said, in dealing with the constitutionality of this election law, viz.:

"The purpose of the Act is to require the voter to cast his own ballot; to do away, as far as possible, with the illegal practice of voting oftener than once, and to defeat bribery, duress, and corruption at the polls. . . . The names of candidates are printed, and with little effort the unlettered voter can soon become as well acquainted with the printed name of his candidate as with his face, and with easy readiness place his $\times$ opposite that name and fold his ticket as required." The fact that a man can neither read nor write does not necessarily disqualify him from marking his ballot. This fact is exemplified in the record in the testimony of at least two witnesses. These witnesses testify that they can neither read nor write, but marked their own ballots. The testimony of one witness was verified in the presence of the lower Court by an actual test of his ability to mark the ballot. So, it does not necessarily follow that because a voter can neither read nor write he cannot mark his ballot, and this fact will not prevent assistance being rendered him if he is blind or otherwise physically disabled. These assignments of error are therefore overruled.

This disposes of all errors of law assigned on behalf of contestant. We come now to notice some of the errors of fact alleged to have been committed by the Court under his own ruling upon the law. As preliminary to the consideration of these alleged errors, we notice the charge of contestant that contestee, without authority of law, appointed special Deputy Sheriffs, who invaded the voting precincts, actively electioneered for contestee, arrested lawful voters, and prevented them from casting their ballots. On this subject the Circuit Judge found as follows, to wit:

"Contestee admits that on election day he did appoint some thirty or forty special deputies, to serve on that day only. Commissions were issued in the words and figures following:

"'NASHVILLE, TENN., Aug. 6, 1896.

"'This is to certify that I have this day appointed ———— to act as special deputy, with full power and authority to serve any criminal process, and to arrest any person or persons violating the criminal laws of this State, and to do any other act that I am authorized to do under the laws of the State of Tennessee, in order to preserve peace and order during the day of August 6, 1896.

"'(Signed)          JOHN D. SHARP,
"'*Sheriff of Davidson County.*'

"No oath of office was administered to any of these deputies, nor was any bond required. These deputies were sent to various polling places through-

out the city.   None were sent to the country, except, possibly, in one or two instances.   The Coroner holding the election had appointed his deputies, and members of the city police force were on duty, as usual, at the various voting places within the corporate limits.   These appointments were made under legal advice, but it is clear, as I think, that they were absolutely void, and conferred no official powers upon the persons undertaking to act as Deputy Sheriffs.   They had no more power to make arrests than ordinary private citizens, and had no right to enter the polling places, except to vote at their own precincts.   They were not instructed to report to the various Deputy Coroners, nor were they to receive orders or instructions from them. The only orders or instructions received by them were those contained in the commissions issued, and others verbally communicated by the Sheriff.   It is true they were instructed not to enter the polling places, except to prevent breaches of the peace, and to arrest persons violating the election laws; but the effect of the appointment and the instructions was to render these men judges of the violation of law, and of the propriety of arrests, without regard to the requests or authority of the duly appointed officers of election.   By the Code (M. & V.), § 1044, it is provided:   'The Sheriff, or, if he is a candidate, the Coroner, or, if there be no Coroner, some person appointed by the County Court, shall hold all popular elections, and said officer, or person,

shall appoint a sufficient number of deputies to hold said election.'

"The Act of 1890, Ch. 24, Sec. 13, provides: 'No person other than the election officers and voters admitted, as hereinafter provided, shall be permitted within said rail. or room where the election is held, except by authority of the officers holding the election, for the purpose of keeping order and enforcing the law.' Section 14: 'No person shall be allowed in the room in which said ballot box and compartments are, except the officers of election and those appointed by the officer holding the election, and none other, to secure the observance of the provisions of this Act.'

"Had Mr. Sharp himself not been a candidate, his right to appoint a sufficient number of deputies to serve as election officers would have been unquestionable, but, being a candidate, he could not lawfully commission deputies for election day only, and send them to the polls to act as such. Aside from the plain provisions of the statute, a sound public policy forbids that the chief peace officer of the county should possess and exercise a power so great, so capable of abuse, and conferring so large an advantage over his opponents; and further appointments so made will not pass unchallenged, and collisions with the regular officers, with the police, or with citizens may follow with the most deplorable results. Such results are all the more likely to occur when, as in this case, all the appointees were

supporters of his candidacy, were selected largely upon the recommendations of political friends, were collected at political headquarters, there instructed, and from thence dispatched to their respective posts. How many were armed, and to what extent, does not appear, except that one had three pistols when he started.

"Assuming that legal advice was sought and accepted in good faith, still, these appointments were nevertheless in direct violation of · law and opposed to sound public policy. The ballot should be absolutely free within the limits of the Constitution and the statutes. · The timid voter should no more be burdened than the bravest, and the public peace should not be imperiled on a day so sacred to American citizens. The proof offered does not justify the rejection, on this account, of the returns from any ward or district. How far individual voters may have been affected will be discussed hereafter, but if none were actually affected, the precedent must be condemned."

We have thus quoted at length from the opinion of the Circuit Judge for the purpose of expressing our unqualified approval of his construction of these statutes, as well as his characterization of the appointment of these deputies as an unlawful and unwarranted act on the part of Mr. Sharp.

*Second Ward.*—It is assigned as error that the Court failed to find that three voters in the Second Ward, to wit, T. M. Campbell, Brown, and Will

Vester, were prevented by Sharp's deputies from voting for Moore. The Court found, in respect to these voters, that there was no proof that they had not in fact voted. An examination of the poll list of that ward shows that persons having the same names did vote. The Court held, the burden being upon contestant, and there being no sufficient evidence that said electors had not voted, the charge fails. We concur in the ruling of the Circuit Judge, and find he is sustained by the record.

*Third Ward.*—It is assigned as error that the Court failed to credit contestant, Moore, with the vote of one F. E. Braden. It is insisted that one Garvey had Braden's poll tax receipt at the polls, and sent for Braden to come and vote; that when Braden arrived at the polls Garvey had been arrested by Sharp's deputies for an alleged violation of the election law and taken to jail; that Braden, upon learning this fact, and being unable to get his poll tax receipt, left the polls and failed to vote. The proof shows that Garvey gave bond and returned to the polls before they were closed. The record shows that Braden was not of age until August, 1896, and hence did not need a poll tax receipt for the year 1895, and could have voted without being required to exhibit a poll tax receipt. Again, the witness, Garvey, shows that Braden had changed his residence after registering, and failed to reregister. Moreover, Braden was not introduced, nor is it shown how he would have voted. We concur with

the Circuit Judge in disallowing Moore a credit for this vote.

*Fourth Ward.*—In this ward contestant insists that the vote of William Freed should be deducted from the column of Sharp. Freed testified that he did not vote in the election. Two witnesses contradicted him and swore he did vote. The character of these two witnesses, however, was such that they were entitled to little credence, and we concur with the Circuit Judge in giving credit to Freed.

*Fourteenth Ward.*—It is assigned as error that the Court failed to charge Sharp with removals of W. A. Lance, Geo. W. Waddle, J. M. Waddle, J. F. Stinnet, and Robt. Johnson. In other words, it is charged these parties voted for Sharp illegally in this, that after registration they changed their respective residences and did not reregister. It is therefore insisted on behalf of contestant, that said votes should be deducted from the column of Sharp. It is true that W. A. Lance, J. F. Stinnet, Geo. W. Waddle, and J. M. Waddle did change their residence after the original registration, but the record shows that each reregistered in July, 1896, preceding the August election. As respects Robt. Johnson, the proof shows he was a delinquent poll tax debtor; he declined to state for whom he voted, and there being no evidence to show that he voted for Sharp, his status was that of an illegal voter, and his vote was prorated between the candidates in accordance with the rule of apportionment agreed upon by the parties.

*Fifteenth Ward.*—Contestant, Moore, assigned as errors that the Circuit Judge charged him with the votes of T. J. Turbeville and Frank Turbeville, as removals, when only T. J. Turbeville voted, and that he had not, in fact, changed his residence. Further, that the Court charged contestant, Moore, with J. H. Charleton as a removal. Contestant admits that in this ward the Court charged Sharp with Jas. Sanders, delinquent, and J. M. Sanders, removal, deducting two votes from Sharp, when, in fact, Jas. and J. M. Sanders are one and the same person. It is shown that Sanders was both a delinquent, that is to say, had failed to pay his poll tax, and had also removed without a reregistration. We are of opinion the Circuit Judge was in error in charging contestant, Moore, with both of the Turbeville votes. It is true that both changed their residences after registration, but the poll lists show that only T. J. Turbeville voted. Frank Turbeville did not vote, and hence it was error to charge Moore with his vote. But this error against Moore is counterbalanced by the error committed in his favor, in charging Sharp with the vote of both Jas. and J. M. Sanders, when both sides concede they are one and the same person. We are further of opinion there was no error in charging contestant with the vote of J. H. Charleton, on account of his removal without reregistration.

*Sixteenth Ward.*—It is assigned as error that the Circuit Judge credited Sharp with one ballot that was

14 P—33

improperly rejected by the judges of election. The proof shows that Sharp was the only candidate voted for on this ballot; but down on one side it had a mark like writing, but not plain enough to be made out. The judges could not say from this marking whether the voter intended to write a name or whether it was simply scribbling; but, aside from this scribbling, the name of Sharp was properly marked. The judges rejected the ballot, upon the ground, probably, that the scribbling would come under the head of ballots marked by voters for identification. The Circuit Judge held that, as the name of Sharp was properly marked with a cross, the ballot should not have been rejected notwithstanding the scribbling on the side of the ballot. Section 17 of the Dortch law provides, viz.: "That if the voter marked more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot should not be counted for such office. But this shall not vitiate the ballot so far as properly marked." Section 18 provides "that any ballot marked by the voter for identification shall be rejected." It appears from an examination of the pleadings that no issue was made by contestee covering such a case, and we therefore think the Circuit Judge was in error in charging contestant with this vote.

*Eighteenth Ward.*—It is assigned as error that the Court prorated the illegal votes of Hamilton, Britton,

Braden, and Gardner between the two candidates, instead of deducting them all from the column of Sharp, since the proof showed that they all favored Sharp.    There is no proof in the record that these men voted for Sharp, and the only proof that they favored Sharp is that their political associations were with men who belonged to the political party to which Sharp belonged.    It would not follow from this that these men voted for Sharp, nor would it afford any presumption of that fact.    These votes being illegal were properly prorated, and should not have been deducted from Sharp, except upon stronger proof that they were cast for him.

*Nineteenth Ward.*—It is assigned as error that the Circuit Judge erred in charging Moore with the vote of D. A. Gee, a delinquent poll tax debtor, when the proof shows that he affiliated with the party that favored Sharp.    Pat Cain, a witness for contestant, does state that the voter, Gee, did associate with the supporters of Sharp, but another witness, J. P. McDowell, proves that he heard Gee say two or three times he intended to vote the straight Democratic ticket.    The Circuit Judge found that he voted for contestant, and was warranted in such finding by the record.

*Second District.*—The complaint made in this district is that Sharp was not charged with the vote of Robt. Scales, upon the ground that Scales was a delinquent poll tax debtor.    This witness proves he was exempted from the payment of a poll tax by

the County Court, and there is no proof to the contrary.

*Fourth District.*—Contestant assigns as error the action of the Circuit Judge in not charging Sharp with the vote of Willie Cockrill, colored, a delinquent poll tax debtor. The Court simply prorated this vote between the candidates upon the ground that his vote was illegal, and it was not shown for whom he voted. Contestant refers us to the evidence of Morgan Hurt as showing that Wm. Cockrill favored the election of Sharp, but upon examination of Hurt's testimony, we find no reference whatever to this voter, nor are we cited to any other evidence tending to show this fact. It is also assigned as error that the Court prorated the votes of twelve inmates of the soldiers' home in this district, upon the ground that their ballots had been illegally marked and that it could not be ascertained for whom they voted. There was no error in this ruling.

*Seventh District.*—It is assigned as error that the Circuit Judge deducted from the vote of Moore the vote cast by John Chadwell, upon the ground that said vote was illegal in this, that said ballot was marked for Chadwell, when the proof shows he was neither blind nor physically disabled. Contestant does not deny that this vote was illegal, but insists it should not be taken from him, for the reason that Sharp, in his answer and cross petition, does not attack the returns of this district for any cause whatever, and this is true, as we find from an examina-

tion of the pleadings. But the contestant does attack the returns from this district upon the ground that one ballot was marked for a person who was not physically disabled, and was valid and counted for contestee and not certified according to law. It having turned out that this illegal ballot was cast for contestant himself and not for contestee, it must be charged to contestant.

*Eighth District.*—The error assigned in this district is that the Court charged Moore with the vote of F. H. King, when there was no charge by Sharp in his pleadings as to removals or nonresidents. It is conceded that the vote was illegal, but it is insisted Sharp cannot get the benefit of it, because he did not make an issue on it in his pleading. We agree with Circuit Judge that weight of evidence shows that F. H. King voted for Moore, but there is no pleading to make an issue on this vote, and the action of Circuit Judge in charging it to Moore was erroneous.

*Thirteenth District.*—Complaint is made by contestant that the Court charged him with the vote of an unknown voter in this district who voted on an altered registration certificate. This assignment is sustained, for the reason that the pleadings of neither side are broad enough to raise this issue. Moreover, the evidence is not very satisfactory that this unknown voter voted for Moore.

*Eighteenth District.*—It is assigned as error that the Court failed to charge Sharp with the votes of

W. J. Gilbert and Geo. Jackson, removals. There is evidence to show that these persons had removed from the district prior to the election, and that they voted for Sharp, but there is no contest made by Moore in this district, nor can the question be fairly raised by any issue presented in the pleadings of Sharp.

*Twentieth District.*—In this district it is claimed the Court erred in charging E. C. Drake as a removal, when the contestee, Sharp, makes no charge as to removals in this district, and the evidence shows Drake did not move off the farm. Contestee did not challenge the vote of this district, and we think the Court was in error in deducting this vote from the column of Moore.

*Twenty-second District.*—The error complained of in this district consists in charging Moore with marked ballots of Kelly, Durand, and Adcock, when contestee, Sharp, made no charge in his pleading of marked ballots in this district. It is true, as alleged, Sharp made no such issue in his pleading, but contestant, in his petition, charged that illegally marked ballots had been cast for Sharp in this district. The Court having found that these ballots were cast for Moore, was correct under the issue raised by contestant in his petition, in charging them to Moore.

*Twenty-fourth District.*—The error assigned in this district is in prorating the votes of five persons, who are shown to be delinquent poll tax debtors,

instead of charging them all to Sharp. There is no sufficient proof in the record to show how these men voted for the office of Sheriff, and it being conceded their votes were illegal, the Court was correct in apportioning them between the candidates.

While we have examined all the assignments made by contestant on the individual votes, we have only mentioned those which are more prominently in controversy. The result of our tabulation and recasting of the vote is a plurality in favor of Sharp of six votes. Having reached this result, we do not review the assignments of error made on behalf of the contestee, Sharp. It suffices to say we have examined them, and find there were errors committed to the prejudice of Sharp, in recasting the individual votes, which counterbalance the errors committed to the prejudice of Moore.

The result is, the judgment of the Circuit Court is affirmed.

PETITION TO REHEAR.

McALISTER, J. This cause was decided at a former day of the term, when the Court adjudged that contestee, John D. Sharp, had been duly elected Sheriff of Davidson County, by a majority of six votes. This result was reached upon a consideration only of the assignments of error to the judgment below made by the contestant, Moore. We did not

pass upon the errors assigned on behalf of contestee, Sharp, for, since he was entitled to an affirmance of the judgment below, upon the errors assigned by contestant, we did not feel called upon to adjudicate the questions raised in the assignments of error made by contestee. We did state, however, in our original opinion, that we had examined the assignments of error made on behalf of Sharp, and had discovered errors committed against him which would largely counterbalance the errors committed in his favor.

Counsel for contestant, however, were not to be discouraged by this statement of the Court, and have presented a petition to rehear, accompanied by briefs, which raise questions presented on the original hearing, and press them with renewed zeal and ability. We have examined this petition, and the errors alleged to have been committed by this Court, with scrutinizing care, verifying the many citations with comparison of the record, poll books, delinquent lists, and other exhibits. It is not possible at this time to discuss *seriatim* each individual vote challenged, hence we will only notice such as have been especially emphasized by counsel.

*Second Ward.*—Complaint is made that the Court, on the original hearing, charged contestant, Moore, with the vote of W. L. Oliver, upon the ground that, as a delinquent poll tax debtor, his vote for Moore was illegal. Counsel now show by the record that W. L. Oliver, at the time he voted, was fifty-four years of age, and hence not liable for a

poll tax.   It is obvious this vote was improperly
charged to contestant by the Court below, and this
error will now be corrected.

*Ninth Ward.*—It is urged on behalf of contestant
that the Court below was in error in charging to
Moore the vote of Thomas A. Murphy, as a delin-
quent poll tax debtor.   The record shows that Thos.
A. Murphy voted for Moore on a poll tax receipt
issued to Martin Murphy.   The theory of contestant's
counsel is, that this receipt was, intended for Thos.
A. Murphy, but was inadvertently issued to Martin
Murphy.   We do not find any satisfactory explana-
tion of this discrepancy.   The vote was *prima facie*
illegal, and we think was properly charged to Moore
by the Circuit Judge.   The proof is clear that
Murphy voted for Moore.   Again, it is assigned as
error that Sharp was not charged by the Circuit
Judge with the vote of Chas. T. Moore, who, it is
alleged, had removed and failed to reregister, as
required by the Act of Assembly.   Moore was ex-
amined as a witness and swore that he did register,
and we find no evidence to overthrow his positive
swearing.

*Thirteenth Ward.*—The complaint made in this
ward is, that the Court below charged the vote of
John Snider to contestant, Moore, upon the ground
that Snider had changed his residence in the ward,
and had failed to reregister.   It is insisted this
was error, for the reason that Jno. Snider did not,
in fact, vote in said election.   We have examined

the poll-books of this ward, and no such name appears in the list of voters. We therefore hold this exception well taken.

*Seventeenth District.*—It is assigned as error that the Circuit Judge charged to contestant, Moore, the votes of six illiterates whose ballots were marked for them, but who were not laboring under any physical disability that authorized it. The names of these illiterate voters were not given in the tabulation made by the Circuit Judge, and this, it is insisted, was error.

The facts in connection with these voters, as disclosed by the record, are, viz.: J. W. Wright, who acted as Deputy Coroner in this district, and who held the election, and whose duty it was to mark ballots for those who by reason of blindness or other physical disability were unable to mark for themselves, testified that, as the officer holding the election, he marked six, eight, or ten ballots for colored voters who were not blind or otherwise physically disabled. The witness further testified that he marked them for the straight Democratic ticket, which, of course, included contestant, who was the Democratic candidate for Sheriff. It is true the names of these illiterate voters whose ballots were thus illegally marked for contestant, are not given, but the record leaves no room for doubt that there were from six to ten of these illegal ballots. The Circuit Judge only charged contestant, Moore, with six of these votes, which was the lowest number stated by any

witness to have been illegally marked. In this, contestant certainly has no ground to complain.

The other assignments are directed to alleged errors of the Circuit Judge in prorating illegal votes. The Circuit Court declined to prorate the vote of any voter unless there was some attempt made to prove for whom he voted. Contestant, in this petition to rehear, only offers to apportion the illegal votes in certain wards and districts. Under the ruling made by this Court on the original hearing, all illegal votes must be prorated, whether there was any proof tending to show how they were cast or not. Applying this rule to all the wards and districts, the apportionment of illegal votes leaves a balance in Sharp's favor.

On the original hearing we stated that, upon examination of the assignments made on behalf of contestee, Sharp, we had discovered errors to his prejudice which would counterbalance the errors committed by the Court in his favor. We think a very palpable error was committed by the Court below in ruling that an order or resolution passed by the County Court of Davidson County, in 1894, exempting from the payment of poll taxes all inmates "now" or "then" in the County Asylum, was a sufficient exemption for all the inmates who voted in the August election, 1896. There were eight of these votes cast for contestant, Moore, which the Circuit Court declined to deduct from his aggregate. This action was erroneous

for the following reasons: Sec. 687, Shannon's Code, provides, viz.: "Any person incapable of labor, wishing to have himself declared exempt from poll tax, shall apply to the County Court by petition, stating the ground of his claim therefor, and if the Court, upon hearing the petition and the testimony produced before them, be of opinion that the petitioner is incapable of labor, they shall declare him to be so of record, and a production of a copy of same, duly authenticated, to the collector, shall be his authority for omitting to collect the poll tax from such person." This is the mode, and the only mode prescribed by law, for the exemption of any voter from the payment of poll tax. It is not pretended that this statute was observed in a single instance in the eight votes now challenged. The only claim these voters offered for exemption from the payment of poll tax was, that in 1894, two years prior to this election, the County Court passed a resolution exempting from poll tax all inmates then in said County Asylum. There is not a syllable of proof that any one of these eight voters was an inmate of the County Asylum in 1894, when this blanket resolution was adopted. These voters were all liable to a poll tax, and there being no valid exemption, and it affirmatively appearing that their ballots were cast for Moore, they must be deducted from his column.

Without noticing other errors assigned by contestee, some of which are well made, we adhere to our original judgment, and dismiss the petition to rehear.