Montoya v. Ortiz, 24 N. M. 616.

[No. 2212.   Sept. 19, 1918.]
# MONTOYA v. ORTIZ.

## SYLLABUS BY THE COURT.

1.   The rule announced in the case of Carabajal v. Lucero, 22 N. M. 30, 158 Pac. 1088, that, in the absence of a showing of fraud on the part of election officers sufficient to invalidate the returns and to cast discredit upon the ballots, preserved as required by law, the individual voters cannot be permitted to testify as to the candidates for whom they voted at an election, has no application to the question of the right of an illegal voter to testify as to the persons for whom he voted at an election.                                        P. 621

2.   In the case of illegal voters, it is universally recognized that the right to examine the voters in such a case is in affirmance and vindication of the essential principle of the elective system that the will of the majority of the qualified voters shall determine the right to an elective office, and the testimony of the voter, after it has been shown that he voted illegally, is competent and should be received by the court for what it is worth.                              P. 622

3.   An illegal voter cannot be required to testify in the first instance as to whether he did in fact vote, if he claims his constitutional privilege against self-incrimination, but, if it is proven by other evidence that he did vote, he may then be compelled to testify for whom he voted.          P. 622

4.   Circumstantial evidence is competent to prove the fact for whom an illegal voter voted, and, where the facts and circumstances in evidence clearly establish for whom he voted, the court is justified in finding the ultimate fact.      P. 623

5.   Circumstantial evidence may be resorted to where it does not appear from the testimony of the voter for whom he voted.                                                     P. 623

6.   Where it is shown that ballot boxes have been in the custody of parties not entitled thereto, the burden rests upon the contestant to show that during such time the ballot boxes were not tampered with.                                   P. 624

7. Departure from the strict letter of the statute, as to the preservation of the ballots will not warrant their rejection, unless the statute so provides, in the absence of fraud or any suspicion of fraud.                    P. 625

8. An election is void where qualified electors are corruptly and fraudulently deprived of an opportunity to vote, sufficient in number, had all been counted for the next highest candidate, to have changed the result of the election.  P. 625

9. An appellate court is not absolutely obligated, on reversal, to render or order final judgment, but the court is invested with a discretion to either render final judgment, or to direct the lower court to enter judgment, or to remand the case for a new trial or other proceedings, and, where it appears that justice requires that a cause be remanded for a new trial, it will be so ordered.                    P. 626

Appeal from District Court, Sandoval County, Raynolds, Judge.

Election contest by Alfredo N. Montoya against Preciliano Ortiz. Judgment for contestee, and contestant appeals. Reversed and remanded.

A. B. Renehan, of Santa Fe, and A. A. Sedillo and R. P. Barnes, both of Albuquerque, for appellant. Neill B. Field and A. G. Simms, both of Albuquerque, for appellee.

### OPINION OF THE COURT.

Roberts, J. At the general election held November 7, 1916, appellant was a candidate on the Republican ticket in Sandoval county for the office of county clerk of said county. Appellee was the candidate on the Democratic ticket. On the face of the returns appellee was elected by seven majority over appellant. Appellant instituted a contest for the office under article 6, c. 32, Code 1915. In his notice of contest he alleged that certain persons not qualified to vote in designated precincts in said county had voted at said election for appellee. He also alleged that the returns made in certain precincts were in-

correct. Appellee answered, denying generally the allegations in the notice of contest, and set up the fact that certain illegal votes had been cast in designated precincts for appellant. Appellant asked for a recount of the ballots in certain precincts as authorized by section 1999, Code 1915. The recount was made by the board of county commissioners as in said section provided, and the result certified to the court. There was a discrepancy between the returns made by the election officers as to three precincts so counted, Nos. 5, 8, and 15, and the return made by the board of county commissioners. The count made by the board of county commissioners, if allowed to stand, would alone have given appellant a slight majority.

The evidence was taken before a commissioner appointed by the court. Appellant introduced evidence to show that in stated precincts certain named persons had voted; that such persons so voting were not residents of the precincts in which they had voted; and it may be stated that the fact that they had voted, and that they were not legal voters within the precincts wherein they so voted, was clearly established by the evidence.

Thereupon appellant placed upon the stand the person so voting and asked for whom he had voted. The witnesses in several instances, without objection, testified that they had voted the Democratic ticket and had voted for the appellee. In other instances the persons so shown to have voted illegally either refused to testify or could not be obtained as a witness. In these cases appellant put in evidence facts and circumstances which he claims show conclusively that the voters in question voted the Democratic ticket. His evidence tended to show that in some instances the voters were taken to the polls by Democratic workers, that they received their ballots from parties engaged in distributing Democratic tickets, and other facts and circumstances which tended to show that the voters in question supported the Democratic candidates.

After the evidence for the appellant was put in, appellee introduced evidence for the sole purpose of impeaching the recount by the board of county commissioners of the three precincts stated. The evidence on this point was quite voluminous, and it would unduly lengthen this opinion to set it out. The evidence directed to this end consisted, first, of the testimony of the election officers in the three precincts in question to the effect that they had correctly convassed the vote and certified the result. In each precinct there was also evidence of some parties present at the count to the same effect. Second, it was shown that the boxes had been sealed with wax, the key of each box tied to a string and dropped in the aperture for the reception of ballots, and paper or cardboard sealed over the aperture; that, as to precinct No. 5, at the time of the recount by the commissioners the card placed over the aperture had been reversed; that one end of the card was loose, so that the key could be removed. As to one of the other precincts it was shown that the lid of the ballot box had been sealed down with wax at the time of the canvass, in addition to sealing the aperture, and that, at the time of the recount by the board of county commissioners, the lid was not sealed. A paper had been sealed over the aperture for the reception of ballots, but it had been sealed in such a manner that the key of the lock could be removed and replaced without breaking the seal. In the other box the key was sealed inside the aperture. The evidence was to the effect that these boxes. or two of them at least, had been taken to Bernalillo, one of the boxes by some one other than the judge of election, it having been sent by a messenger carrying boxes from other precincts. When the boxes reached Bernalillo they were taken by the parties having them in charge to the county clerk's office. There they were told either by the county clerk or by some other person that it was their duty to send the boxes to Antonio Lucero, Secretary of State, at Santa Fe. Thereupon the boxes were taken by the persons having them in charge

to the Wells Fargo Express office, in Bernalillo, and were sent by express to the Secretary of State. Just how long these boxes remained in the possession of Mr. Lucero does not clearly appear, but some time after his receipt of the boxes he sent them by express to the county clerk of Sandoval county at Bernalillo. The county clerk testified that, during the time the boxes were in his possession prior to the canvass of the returns by the board of county commissioners, he placed the boxes in a closet in his office, having a wooden door, locked by an ordinary lock, and that each political party appointed guards who stood watch, both day and night, until the completion of the canvass by the board of county commissioners; that immediately after the canvass he placed all the ballot boxes in the iron safe in his office; that his predecessor in office knew the combination to the safe, and that the appellant in this case had been the county clerk of the county immediately prior to the election of appellee's predecessor; that he purchased the safe and knew the combination; that the ballot boxes remained in the safe until after the institution of the contest herein, when, by order of the district court, he took the boxes to the First Savings Bank & Trust Company in Albuquerque, and they were placed in the vault of said trust company for safe-keeping.

Mr. Montoya testified that he did not know the combination to the safe in the clerk's office; that while he was county clerk he did not give personal attention to the office, but left it in charge of his deputy, and that the deputy alone knew the combination to the safe.

All the parties having charge of the ballot boxes in question, with the exception of the Wells Fargo Express Company agent, the Secretary of State, and the officers and agents of the First Savings Bank & Trust Company, testified that while the boxes were in their possession they were not tampered with. The county clerk said that he had not interferred with them, but he did not

know whether the safe had been opened while they were in it by other persons.

No further evidence was introduced by the contestee. Upon this state of the evidence the contestee moved the court for judgment upon the ground that no legal evidence had been introduced tending to sustain the appellant's right to the office. Later appellee filed a request for certain findings of fact, and the court found in findings 4 and 5 as follows:

"(4) That the said ballot boxes of precincts 5, 8, and 15, when presented to the board of county commissioners to be opened for a recount of the ballots then contained therein, were in such condition that the recount so reported by the said commissioners is discredited; that the seals of the said boxes were broken, and not in the same condition as when they were returned to the clerk by the officers of the election; and the court finds that the evidence is not sufficient to show that the ballots found in the said boxes in said recount were the identical ballots cast at said election, or that the same had not been tampered with or changed. The court further finds that the original certificates of the officers of election held at said precincts 5, 8, and 15 are true, and respectively correctly state the result of said election in said precincts.

"(5) That no other competent legal evidence was introduced by the plaintiff to support his contest."

Judgment was entered for the appellee, from which judgment this appeal is prosecuted.

[1] The finding by the court "that no other competent legal evidence was introduced by the plaintiff to support his contest" was based upon the theory that it was not competent for an illegal voter to testify for whom he voted, and that circumstantial evidence tending to show for whom an illegal voter had voted was likewise incompetent. It is clear, from the argument of counsel before this court, that the trial court was led into error by an erroneous interpretation of the opinion of this court in the case of Carabajal v. Lucero, 22 N. M. 30, 158 Pac. 1088. Appellee in his brief refused to discuss the merits of the points raised by appellant in this regard, saying that the questions were fore-closed by

the above case. His counsel in oral argument before the court contended that the case of Carabajal v. Lucero was correctly decided, and that the same rule applied in this case. In the Carabajal Case, which was a contest for the office of justice of the peace, the contestant had been defeated on the face of the returns by something like 20 or 25 majority. There was no question raised as to illegal votes. All voters who voted at the election were concededly qualified voters. The contestant there placed upon the stand some 90 or more voters, who testified that they had voted, or intended to vote, for the contestant. Had this number of votes been counted for contestant, he would have been elected. The question there was whether, in the absence of a showing of fraud on the part of election officers in the conduct of the election or the canvass of the returns, a court could properly go behind the returns and ballots, and inquire of the individual voter as to how he cast his ballot at the election. We held that it was not competent to impeach election returns, in the absence of a showing of fraud or corruption sufficient to invalidate the returns, by the testimony of individual voters that they had voted for or against a certain candidate. We are satisfied with the correctness of the rule announced in that case, but it has no application to the questions involved here. In this case the voters were not legal voters in the precincts in which they voted. If the rule announced in the Carabajal Case is not to prevail, in every election held in this state it would be possible to contest the result in the courts by bringing in the voters and asking them for whom they had voted.

[**2, 3**] But in the case of illegal voters it is universally recognized that the right to examine the voters in such a case is in affirmance and vindication of the essential principle of the elective system, that the will of the majority of the qualified voters shall determine the right to an elective office, and that the testimony of the voter, after it has been shown that he voted illegally, is competent, and should be received by the court or

jury for what it is worth. 9 R. C. L. pp. 1150, 1151. The law protecting the secrecy of the ballot is intended to apply only to lawful voters, and does not ordinarily apply to or protect illegal voters, who can be required to testify as to how they voted at an election. The further authorities sustaining the rule can be found in the case note to the case of People v. Turpin, 22 Ann. Cas. 724, and to the case of People v. Pease, 84 Am. Dec. 242. This rule tends to secure purity of elections. Were the courts to close their doors to the reception of evidence as to how an illegal voter had voted, it would tend to promote fraud and encourage corruption. McCray on Election, § 494. Many cases will be found in the notes cited to the effect that such evidence should be received where it is first shown that the voter was not qualified and that he did in fact vote. The authorities are to the effect that an illegal voter cannot be required to testify in the first instance as to whether he did in fact vote if he claims his constitutional privilege against self-incrimination. McCray on Elections, § 492. But, if it is proven by other evidence, that the voter did vote, he may then be compelled to testify for whom he voted. In the present case it was shown that the voters in question were nonresidents of the precincts in which they voted and that they did in fact vote. The voter was then called to the stand, and testified without objection for whom he voted. It is held that neither the contestant nor the contestee is called upon to contend for the rights of a witness who does not demand protection, and, if the witness is compelled to testify, it does not follow that his testimony, which is competent without objection on his part, should not go to the court or jury for what it may be worth. 9 R. C. L. § 142, p. 1150.

[**4, 5**] Another question is as to the right of the contestant to introduce evidence for the purpose of showing for whom an illegal voter voted and the weight to be given to such testimony. It is generally held that circumstantial evidence is competent to prove the fact for whom an illegal voter voted, and that, where the

facts and circumstances clearly establish for whom the voter voted, the court is justified in finding the ultimate fact. White v. Slama, 89 Neb. 65, 130 N. W. 978, Ann. Cas. 1912C, p. 518. In the note to the above case the author of the note says:

"The decisions generally support the holding of the reported case to the effect that circumstantial evidence is admissible to prove for whom illegal votes were cast at an election."

Many cases are cited in support of the text. Circumstantial evidence may be resorted to where it does not appear from the testimony of the voter for whom he voted. Tunks v. Vincent, 106 Ky. 829, 51 S. W. 622; Lane v. Bailey, 29 Mont. 548, 75 Pac. 191; People v. Pease, 27 N. Y. 72, 84 Am. Dec. 242, per Selden, J.; Boyer v. Teague, 106 N. C. 626, 11 S. E. 665, 19 Am. St. Rep. 547; Moore v. Sharp, 98 Tenn. 491, 41 S. W. 587. In the note in Ann. Cas. 1912C, p. 521, will be found many cases showing the facts and circumstances which justify a finding as to the party for whom the illegal vote was cast.

The evidence in the case at bar, as it stood at the time the finding was made by the court, was sufficient to show that appellant was entitled to the office, and the court erroneously held that there was no evidence to sustain the contest.

[6] As to the rejection of the recount made by the board of county commissioners, it is sufficient to say that upon the state of the evidence the court properly rejected the recount. The rule is well settled that, where it is shown that the ballot boxes have been in the custody of parties not entitled thereto, the burden rests upon the contestant to show that during such time the ballot boxes were not tampered with. In this case the contestee showed that the ballot boxes for a time had been in the possession of the Secretary of State and of the Wells Fargo Express Company, and no evidence was introduced to show that during such time the integrity of the boxes was preserved. The contestee unnecessarily

assumed the burden of showing that the boxes had been tampered with. We are satisfied with the rule stated in 9 R. C. L. § 153, as follows:

"One who relies, therefore, upon overcoming the prima facie correctness of the official canvass by a resort to the ballots, must first show that the ballots as presented to the court are intact and genuine. Where a mode of preservation is enjoined by the statute, proof must be made of a substantial compliance with the requirements of that mode. But such requirements are construed' as directory merely, the object looked to being the preservation inviolate of the ballots. If this is established, it would be manifestly' unjust to reject them merely because the precise mode of reaching it had not been followed. So, too, when a substantial compliance with the provisions of the statute has been shown, the burden of proof shifts to the contestee of establishing that, notwithstanding this compliance, the ballots have in fact been tampered with, or that they have been exposed under such circumstances that a violation of them might have taken place. But this proof is not made by a naked showing that it was possible for one to have molested them."

The case of Newhouse v. Alexander, 27 Okl. 46, 110 Pac. 1121, 30 L. R. A. (N. S.) 602, Ann. Cas. 1912B, 674, affords an able and exhaustive discussion of the question as to when ballots should be received in evidence and when rejected.

[7] Departure from the strict letter of. the statute as to the preservation of the ballots will not warrant their rejection, unless the statute so provides, in the absence of fraud or any suspicion of fraud. A valuable and exhaustive case note on this subject will be found in 30 L. R. A. (N. S.) 602. And it is possibly unnecessary to discuss the question further. Whether the ballots have been so preserved that their weight as evidence is sufficient to overcome the returns made by the election officers is ordinarily a question for the trial court to determine.

[8] One further question should possibly be noticed. There was some evidence to the effect that three or four qualified voters had been denied the right to vote in precinct No. 2, Corrales. Some of the parties were registered, while one, at least, was not. But there was some slight evidence to the effect that he had presented to

the election judges an affidavit of his residence and qualification. The election judges refused to receive the ballots; hence did not register the name of the person whose vote was rejected in the poll book, together with the names of the persons for whom he offered to vote, as required by section 2018, Code 1915. The rejection of these votes may not have any bearing upon this contest, for it is well settled that the rejection of the votes of qualified voters will not invalidate an election, unless it is shown that the acceptance of the vote might have changed the result. Upon the ultimate trial of this case the votes in question may not have such effect. The rule is well settled that an election is void where qualified electors are corruptly and fraudulently deprived of an opportunity to vote sufficient in number, had all been counted for the next highest candidate, to have changed the result of the election. Martin v. McGaar, 27 Okl. 653, 117 Pac. 323, 38 L. R. A. (N. S.) 1007; and see note to the above case in L. R. A. (N. S.)

[9] Appellant contends that, as appellee's demurrer to the evidence was sustained, this court should here enter judgment for appellant. Appellee, on the other hand, says that the motion interposed by him was not a demurrer to the evidence. This question need not be considered, for we believe that justice requires that the case should go back for further evidence, in order that appellee should have an opportunity of combating the proof introduced on behalf of appellant, and also to sustain his answer to the effect that illegal votes were cast for appellant. The rule is that an appellate court is not absolutely obligated on reversal to render or order final judgment, but the court is invested with a discretion to either render final judgment, or to direct the lower court to enter judgment, or to remand the case for a new trial or other proceeding. 4 C. J. p. 1186.

For the reasons stated, the case will be reversed and remanded for further proceedings in accordance with this opinion; and it is so ordered.

HANNA, C. J., and PARKER, J., concur.