## MARTIN v. McGARR.

No. 1453.   Opinion Filed September 13, 1910.

Rehearing Denied January 3, 1911.

1. ELECTIONS—Formation of Precincts—Failure of Officers to Perform Duties—Effect—Mandamus. Under the terms of section 3106, Compiled Laws of Oklahoma, 1909, it is the duty of the county election board, in creating or altering voting precincts, to include therein only such territory as shall be within a ward or township and to change the boundaries of any precinct by dividing or consolidating two or more into one when public convenience or public good may require it, and such duty on the part of said board is enforceable, under the specific terms of said act, by mandamus by any qualified elector of the county. In the event of failure on the part of said board to act in accordance with the terms of the said statute, the remedy afforded the electors is mandamus to secure a correction of the same. Where the board fails to perform its duties in a legal manner and mandamus has not been invoked to require it. the election

will not be held void because qualified electors are denied the privilege of registering or voting.

2.    ELECTIONS—Reception of Illegal Ballots—Effect... An action, brought for the purpose of having an election declared void, will not be sustained by showing merely the reception of illegal ballots. An election is held void in those cases only where it is impossible to separate the valid from the invalid ballots and the correct result is impossible of determination.

3.    ELECTIONS—Absence of Election Supplies—Effect—Duty of Electors. Under section 3202, Comp. Laws of Oklahoma, 1909, it is the duty of the electors of precincts failing to receive the election supplies to proceed, under its terms and provisions. to prepare ballots, boxes, etc., and to hold an election as nearly as may be in conformity with the law, and where in such case they fail or neglect to do so, they will be held to have been parties to their own disfranchisement. and the election will not be held void on that account.

4.    ELECTIONS—Electors Deprived of Opportunity to Vote—Effect. An election is void where qualified electors are corruptly and fraudulently deprived of an opportunity to register and vote sufficient in number, had all been counted for the next highest candidate, to have changed the result of the election.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; John H. Pitchford, Judge.*

Action by T. H. Martin against A. F. McGarr. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

*W. H. Kornegay, W. G. Robertson, Geo. S. Ramsey, Geo. A. Murphey* and *A. A. Davidson,* for plaintiff in error.
*Bailey & Wyand* and *Owen & Stone,* for defendant in error.

DUNN, C. J. This is an action in the nature of *quo warranto* brought to try the title to the office of mayor of the city of Muskogee, and grows out of an election held in that city on April 27, 1909. The plaintiff, who is also the plaintiff in error, was elected mayor, on April 2, 1907, for a term of one year and until his successor was duly elected and qualified. Under this election he took possession of the office and remained therein until November 17, 1907, and from and after that date, by virtue of the Constitution and laws of the state of Oklahoma, he continued as

mayor of the said city and is now claiming, on grounds here-after noted, that he is still entitled to hold and occupy the office. At the election held April 27, 1909, there were three candidates for mayor, Ira L, Reeves, Republican, A. F. McGarr, Democrat, and L. C. Northcutt, Socialist. At said election 3105 votes were cast for the office of mayor, and the county election board of Muskogee county, on a canvass thereof, determined that A. F. McGarr, the defendant in error, had received a plurality of 14 votes and declared him elected, and issued to him a certificate of election to that office. The petition avers that under the said certificate he has taken possession and continues to exercise the functions of the office and to exclude plaintiff therefrom. It is plaintiff's contention that, by reason of the various acts of the election officials who conducted the election, a sufficient number of qualified voters were corruptly and fraudulently denied the right to vote to change the result of the election and that, by reason thereof, the election was void; that, in effect, no election was held and that he is entitled to continue in the office of mayor under and by virtue of the terms of his first election. To his petition the defendant McGarr filed a demurrer, and, on the same being sustained by the trial court, the cause has been brought to this court by petition in error and case-made.

The petition is voluminous, covering something over forty-five typewritten pages, and presents for our consideration a multitude of charges under which plaintiff contends in excess of five hundred qualified electors residing in that city were disfranchised, over one hundred of whom duly presented themselves for voting and were denied ballots. Plaintiff's attitude is not that of a contestant for the office of mayor, as no votes were cast for him: his contention is that the election is void, and of no force and effect whatsoever, and that this condition was brought about, among other things, by the deliberate, corrupt, and fraudulent conduct of the election officials, in consequence of which a sufficient number of qualified electors of the city, tendering themselves for the purpose of exercising the right of franchise, were denied the priv-

ilege to nullify the election. A comprehensive view of the averments of plaintiff's petition causes them to naturally fall into three parts, which may be disposed of as follows: First, as it is manifest plaintiff cannot be heard to plead an irregularity which does not have the effect of rendering the election void, those averments relating merely to the admission of illegal votes must be eliminated; second, those irregularities, the remedy for which is plainly provided for and set forth in the statute available to plaintiff and the electors prior to the election, and which was not pursued, must be held on the part of plaintiff in error to have been waived; third, those averments relating to the alleged corrupt and fraudulent denial of the right to register and to vote to qualified electors sufficient in number to effect the nullification of the election. We will deal with these propositions in the order here presented.

While a contestant in an election may always object to the counting and consideration of fraudulent or illegal votes, yet the reception of the same will in no instance result in the avoidance of the election except where the entire poll is so tainted that the good votes cannot be separated from the bad, and it is impossible to ascertain for whom the majority of the valid ballots were cast. The general rule obtaining throughout all the states of the union is that an election is not to be held invalid except as a last resort, the correct doctrine being announced by Judge Brewster, in the case of *Batturs v. McGary,* 1 Brewster, 162, as follows:

"The court have the power to reject an entire poll, but only in the extremest case—as where it is impossible to ascertain the true vote. Impossibility is the test."

The rule thus annunciated finds support in the following authorities: McCrary on Elections (4th Ed.) secs. 523, 524; Paine on Elections, sec. 513; 10 Am. & Eng. Ency. of Law, p. 770; *Windes v. Nelson,* 150 Mo. 51; *Ferguson v. Allen,* 7 Utah, 263; *Woolley, etc., v. Louisville Southern Ry. Co.,* 93 Ky. 223; *State ex rel. Kellogg, Atty. Gen., v. Sullivan et al.,* 44 Kan. 43; *Attorney General ex rel. Seavitt v. McQuade,* 94 Mich 439, 53 N. W. 944.

In the case last cited, the same doctrine is stated by the Supreme Court of Michigan, with numerous authorities to sustain it, as follows:

"When fraud on the part of the officers of election is established, the poll will not be rejected, unless it shall prove impossible to purge it of the fraud."

Under this rule, therefore, plaintiff cannot raise the question of the reception of illegal ballots and insist that the election be held void on this account, for, should they be established, the consequence would not be to avoid the election, but to reduce the votes to those which were legal and valid and from which the result would be determined. There is no averment that they could not be eliminated and the true result ascertained. Their rejection might result in the election of another man mayor but he must speak for himself—plaintiff cannot sue for him.

Within the rule laid down under the second proposition, in our judgment all of plaintiff's averments in reference to ward four will fall. Plaintiff complains that the county election board unlawfully failed and refused to recognize certain ward boundaries of the city of Muskogee as established by an ordinance of the city council. That in such action several precincts were thrown partly in one ward and partly in another and that the county election board refused to readjust the boundaries thereof, the consequence of which was that four hundred voters residing in the territory thus affected were disfranchised. It is further charged that this action on the part of election officials was deliberately done with the intent to defraud the voters residing in this ward out of their votes. Counsel for defendant insist that the action of the election board was in strict conformity with the law and that the alteration of ward boundaries by the city council was void. As we view this case, it is of no consequence at this time whether the action of the election board in refusing to recognize the ward boundaries was correct or not. The statute under which the election board acted is section 3106, Comp. Laws of Okla. 1909; herein it is made the duty of the county election board to create,

alter, or discontinue voting precincts either in the town or country, and it is provided that all the territory included within a voting precinct shall be within a ward or township and that the territory shall not extend beyond the boundary lines of a ward or municipal township, and that such board may change the boundaries of any precinct by dividing any precinct into two or more or by consolidating two or more into one, and providing for a notice to be given thereof. It was evidently recognized that election boards, either inadvertently, carelessly, or corruptly might act contrary to the terms of this section of the statute. It was doubtless further recognized that such action on the part of these election boards might result in the disfranchisement of some of the electors residing in precincts the boundaries of which were changed. It, of course, was not the intention that this should ever occur, but to our minds it was the manifest intention, in order that no election might be rendered void, to place the burden upon the electors affected by the action of the board of acting in time to prevent such disfranchisement and evil result, for the last sentence of the act provides in specific terms that:

"If such board shall fail to act as herein directed, any qualified elector of the county may apply for a writ of mandamus to compel the performance of this duty."

The plaintiff in this action, like those who he claims were disfranchised, was a qualified elector; he was a resident of the city of Muskogee; the matters of which he complains relate to the action of the county election board in the creation of precincts in ward four of the city of Muskogee; the section of the statute provides for notice of change of precincts; the petition in this case shows that notice of the action of the board was given; and it is clear to us that the statutory relief specifically pointed out was the remedy assigned for any improper action on the part of the board, and not the relief which plaintiff here seeks. A writ of mandamus applied for at any time, even within the month, would have corrected any improper action on the part of the board. It will be noted that the remedy is open, not alone to those who

would be affected in their own registration by the action of the board, but to any qualified elector of the county, and this, in our judgment, was the remedy to which plaintiff was required to resort, and an exclusive one, and, having failed to act when he could have done so, and when his action would have produced no result but good, he cannot now be heard to speak on this subject, when to hear him might result in nullifying the votes of all qualified electors which were cast and which would bring no affirmative relief to those who were denied the right to vote.

In this connection we may also consider the proposition raised by paragraph 15 of plaintiff's abstract, wherein it is averred that there were two precincts at which fifty voters were present for the purpose of voting, and that no polls were opened or ballots printed, the result of which was that these electors were not enabled to vote. Muskogee is the county seat of the county, at which place is located the county election board, with the supplies to equip all legal voting places. This board had, or should have had, at its disposal, booths, ballots, and all the other election paraphernalia subject to the call of the inspectors and other election officials, as well as the electors of all the precincts. The slightest diligence on the part of the electors would have secured for them the necessary supplies for holding the election. There is no averment that any diligence whatsoever was exercised. Moreover, section 3202, Comp. Laws of Okla. 1909, provides that, in the event the supplies in any precinct fail to be delivered by 9 o'clock of the morning of any election, whenever as many as ten electors of any precinct, entitled to vote, are assembled, or at any hour during the day thereafter, they may proceed to hold an election by choosing representatives from the several political parties desiring to assist in such work, and such representatives, when so chosen, may proceed to prepare written ballots which may be cast by the electors in a box to be prepared for that purpose. Herein, in our judgment, is the remedy plainly provided by statute for the deficiency of which plaintiff complains. This remedy should have been pursued by the electors, instead of negligently

allowing the time and opportunity to pass when they might have voted, and it would be unjust to set the entire election aside because of their failure.

The case of *State ex rel. Wood v. Baker*, 38 Wis. 71, was a contest between two candidates for the office of clerk of the county court in one of the counties of Wisconsin. Informal and irregular registry lists were used by the election officials at several different precincts. They were too irregular to allow the electors to vote thereunder without the supplemental affidavit required in the absence of registration. The court, in considering the question of the right of these voters to participate in the election, and referring to the case of *State v. Hilmantel*, 21 Wis. 566, said that every voter is made or may become an agent in the execution of the law, and in any case where a voter's name has been omitted, the burden of answering the requirements of the law by furnishing affidavit and proof is thrown upon him, and he is presumed to know the law and to go to the polls and comply with its conditions. And the court said:

"In such case, if a voter be disfranchised, he is by his own omission a voluntary party to his disfranchisement."

So that, in the precincts where plaintiff complains there was no election paraphernalia, the voters had the power, if they desired to remove the difficulty, by complying with the simple statutory directions, and in this case it may be said, as was said by the Supreme Court of Wisconsin in the case from which we have quoted, if the voters were disfranchised, they were, by their own omissions, voluntary parties to their disfranchisement, and such action on their part ought not to result in the disfranchisement of all of the other qualified electors who cast their ballots. This section of the statute clearly contemplates that it should be pursued, to the end that the election may not fail. It is for the benefit of the electors, placing in their own hands a ready means of participating in an election where the officers are delinquent, and it is their duty to pursue it. See, also, *Hoxie v. Edwards*, 24 R. I. 338.

This brings us to the consideration of the third proposition. It is plaintiff's contention that the corrupt and fraudulent de nial of the right to register and vote of electors, sufficient in number which, had they all cast their ballots one way, would have changed the result of the election, renders the election void; that no candidate was elected therein, and that he, by virtue of the terms of his previous election, continues to hold the office, for the reason that his successor has never been elected. In the instant case, as is noted, defendant received a plurality of fourteen votes over his next highest competitor, and it is the contention of plaintiff that if fifteen qualified electors were fraudulently and corruptly denied the right to vote, this fact of itself is sufficient to nullify the election; that because fifteen electors were disfranchised, therefore thirty-one hundred electors who cast their ballots should have their ballots disregarded and all held for naught; that this result should follow, notwithstanding the fact that there is no averment in the petitoin that all fifteen of the said electors might not have added their votes, had they been permitted to vote, to the other fourteen; that the fact that the election is rendered uncertain and it is impossible to tell who would have been the successful candidate is sufficient reason to nullify it entirely. On the other hand, defendant contends that the proper remedy in a case of this character is to ascertain the precincts in which the qualified electors were denied their right to vote and reject the total vote of that precinct. In other words, the logic of their position is that in a precinct where there are two hundred qualified electors, one-hundred of whom are permitted to vote, and the balance rejected, because of this wrongful disfranchisement of half of the legal voters, then the balance of the legal voters, those who lawfully cast their ballots, should also be disfranchised. Neither horn of the dilemma looks very inviting, but we cannot accept this, and it finds practically little or no support in the authorities. The questions presented are difficult and of  great importance, and novel in this jurisdiction. Counsel have briefed the same on both sides with marked ability and zeal, and the court has sup-

plemented their efforts with a most careful examination of every authority available. The principle for which plaintiff contends appears to find ample support in the authorities, among which may be noted the following: Cooley's Const. Lim. (7th Ed.) p. 933; *Howell et al. v. Pate et al.* (Ga.) 46 S. E. 667; *McDowell v. Rutherford Ry. Const. Co. et al.* (N. C.) 2 S. E. 351; *Smith v. Board Co. Com'rs Skagit Co.*, 45 Fed. 725; *State ex rel. Harris v. Scarborough,* 110 N. C. 232; *State ex rel. Spence v. Judge of Ninth Judicial District,* 13 Ala. 805; *Maloney v. Collier* (Tenn.) 83 S. W. 667; *People ex rel. Hart v. Phillips et al.,* 1 Denio, 388; *In the Matter of Election of Directors of the Long Island Railroad Co.,* 19 Wend. 37; *State ex rel. Atty. Gen. v. Mc-Daniel et al.,* 22 Ohio St. 354; *Fort Dodge City School Dist. v. Dist. Township of Wahkansa,* 17 Iowa, 85; *People ex rel. Wallace v. Salomon,* 46 Ill. 415; *Newcum v. Kirtley,* 52 Ky. 515; *Marshall v. Kerns,* 2 Swan (Tenn.) 68; *Renner v. Bennett,* 21 Ohio St. 431; *Barry v. Lauck,* 5 Coldwell, 588; *Zeiler v. Chapman,* 54 Mo. 562.

So far as our investigation has gone, the claim of defendant finds colorable support in the cases of *State ex rel. Bancroft v. Stumpf,* 23 Wis. 630, and *People ex rel. Foley v. Kopplekom,* 16 Mich, 342. The Wisconsin case involved the office of treasurer of a county. It appeared that at one of the precincts there was no registry of the voters as required by law, and none of the persons voting at the election offered the affidavit as prescribed by law in order that their votes might be received without registration. The court held that the law gave the right to electors to show by affidavit their qualifications to vote in cases where they were not registered. It was made manifest for whom the votes were cast, and they having been improperly received, the court rejected them, and declared the result on the balance of the ballots cast.

In the Michigan case the office of sheriff of the county was involved. In one of the townships there had never been any valid registration of the voters or any legal board of registra-

tion.  A large number of electors in the township mentioned, without having registered, were permitted to vote and their votes were cast for one of the parties and gave him a majority.  If these votes were held invalid, the result would have been the election of his adversary.  The court in that case held that, notwithstanding the fact that the electors were legal voters, the law requiring registration was mandatory, and that the votes so polled were invalid, and rejected the same.  In each of these cases it is observed that the electors cast their ballots and it was definitely known for whom they were polled.  In the Wisconsin case the electors were directly at fault and thus submitted to their own disfranchisement, while in the Michigan case this was not true; but in both cases the court took the same action and rejected the precinct and counted the balance of the ballots cast in the county.  Under a similar state of facts to the Michigan case, the Supreme Court of Missouri held the entire election void.  In that case, *Zeiler v. Chapman, supra,* the contest was over the office of treasurer.  One hundred thirty-nine votes were polled at a certain precinct for the candidate shown by the returns to have been successful.  The registration books of that precinct showed that only about thirty voters were registered.  By an exclusion from the court of the ballots of the unregistered voters, the respondent would have been defeated and the relator elected by the balance of the votes cast. The facts in reference to the registration were that the registry officer kept his office open but one day, at which time he registered thirty voters and immediately resigned.  Application was then made to the proper official for the appointment of another registration official.  The same was denied and no registration was completed, although the electors attended at the place of registration for the purpose of registering.  On election day, however, they all attended the election and were permitted to vote. The court held that the ballots of the non-registered voters could not be counted; that the refusal to comply with the law on the part of the officers of registration rendered the entire election

void, and that the contestor in the case was not elected, the court saying:

"There was really no election, as the officers appointed to supervise the registration failed or refused to perform their duty. It was never intended, we presume, to place it in the power of the registering officers to defeat the will of the electors by refusing or failing to perform the duties imposed on them by law. This would be an outrage on the principle of popular election which the law concedes. The only effect of no registration in a case such as this, where no registration is possible, is to render the election a nullity."

It will thus be seen that, on practically the same state of facts, the Supreme Court of Michigan found the remedy was in the rejection of the ballots cast by the unregistered electors, while the Supreme Court of Missouri held the result was to avoid the entire election.

A careful review of all the authorities from the courts of last resort has led us to the conclusion that the basic reason underlying the rule requiring the election to be held void is not only the fact that qualified electors have been denied, through corrupt action of officials, the right to vote, but it is on account of the further fact that the rejection of enough votes, which, had they been cast for the next highest candidate, would have been sufficient to change the result of the election, renders it impossible to know who was elected. In other words, it is the irremovable and fixed uncertainty injected which demands that the election shall be declared void that underlies the rule. In each of the cases last referred to, while qualified electors had their ballots rejected after having been cast, the fact that they were cast removed this uncertainty, and hence in such a case the rule adopted in Wisconsin and Michigan, in our judgment, is the rational one, while that from the Supreme Court of Missouri is not against the weight of authority found in a number of other cases, but, as it appears to us, is against the weight of reason. In these cases it was not the fault of either candidate that the election officials of any particular precinct failed in the performance

of their duty, nor was it the fault of all of the balance of the electors of the county; they had each and all done their full duty. Certainly it was a wrong and a misfortune that the qualified electors were denied their right to vote, or rather had their votes' rejected after being polled, but this would not be righted by the rejection of the votes of the other electors of the county, when all uncertainty in the result of the election was entirely removed by the actual casting of the votes. A few congressional cases have held that the ballot of a qualified elector who is denied the privilege of voting is entitled, on proof, to be counted for the candidate for whom the elector testifies it would have been cast; but this rule, so far as we have discerned, has never found lodgment in the courts. The correct rule is that a voter denied the right of casting his vote cannot be heard to say for whom it would have been cast. Cooley, Const. Lim. (7th Ed.) p. 933; *Newcum v. Kirtley,* 52 Ky. 515; *Pennington v. Hare,* 60 Minn. 146, 62 N. W. 116. The Supreme Court of Minnesota, in the case of *Pennington v. Hare, supra,* speaking through Mr. Chief Justice Start, discussing this proposition, says:

"This court found as a fact, with reference to the 12 supposed votes, that 12 qualified electors of the Second precinct entered the polling booth with the intention of voting for the respondent, but by an erroneous decision of the judges they were not permitted to vote; that they were not prevented from voting by fraud or intimidation. If these electors had been prevented from voting by fraud or violence, it might and probably would have been the duty of the court to have rejected the entire vote of the precinct, or declared the election void, as justice might require. It is not necessary to decide this point, for the record presents the simple question, can votes not cast, because of an error of judgment on the part of the election officers, be counted as if cast and returned? We are clearly of the opinion that they cannot be. Where a ballot has been marked by the elector, properly cast, and returned, we have something tangible and certain to deal with, and from it we unerringly read the intention and act of the elector. But where, as in this case, the supposed ballots were never in existence, and we must rely upon the subsequent declaration of the electors as to how they intended to and

would have marked and cast their ballots, if they had voted, it would be an uncertain and dangerous experiment to attempt the task of ascertaining and giving effect to their intentions, as ballots actually cast and returned. Uncertain, because it would be simply a matter of speculation; dangerous, because it would give to such electors the power of determining the result of an election, in a close contest. All that it would be necessary for them to do, in such a case, to decide the election, would be to declare that they intended to vote for a particular candidate. It would enable them to sell the office to the candidate offering the highest price for it, because they would not be called upon for their declaration until a contest arose, after the actual ballots had been counted, and the precise effect of their statement known. They could swear falsely as to their past intention, without fear of punishment, for how would it be possible to disprove their statements as to their intentions with reference to a/ supposed act, if perchance they had acted? Cooley, Const. Lim. 781. It seems a hardship that an elector should lose his vote by reason of an error of the election judges, but errors of judgment are inevitable; and, whenever any possible remedy which can be suggested is inconsistent with the highest public interests, they are remediless. The proposition that the title to a public office can be made dependent upon the subsequent statements of an elector as to what he would have done, if he had been permitted to vote, is not only contrary to sound public policy, but seems to be simply unthinkable."

It will thus be seen that the insurmountable uncertainty injected into the result of the election is the primary, controlling fact demanding its avoidance, when electors in sufficient number have been fraudulently denied the right of franchise to overcome the majority or plurality cast for the apparently successful candidate. All ballots of electors who are not registered, or who for any other reason are not qualified, when cast, and it is possible to identify them, should be rejected, and the result declared upon the unimpeached and valid ballots cast.

The conclusion to which the foregoing leads us results in a reversal of the judgment of the trial court in sustaining a demurrer to the petition. It will be noted, however, that there is eliminated from the petition and consideration of the court those aver-

ments which grow out of the alleged disfranchisement of electors caused by the action of the county election board in ward number four; also all those portions relating to the reception of illegal ballots and the failure of the electors in two precincts of the Fourth ward to provide themselves with election paraphernalia; and there is left for response on the part of defendant those portions of the petition only which aver that, by the fraud or corruption of the registration and other officials, sufficient number of qualified electors were denied the right to register and to vote to have changed the result of the election.

The cause is accordingly remanded to the district court of Muskogee county, with instructions to set aside the judgment heretofore rendered and proceed in accordance with this opinion.

HAYES, KANE, and TURNER, JJ., concur; WILLIAMS, J., concurs in conclusion.