## SNYDER v. BLAKE.

No. 3266.   Opinion Filed October 22, 1912.

Rehearing Denied January 14, 1913.

(129 Pac. 34.)

**ELECTIONS—Contests—Fraud—Evidence.** One who seeks to have an election declared void and set aside upon the ground that by irregularities and fraudulent misconduct of the election officers in some precincts persons were prevented from voting must allege and prove that such persons were qualified voters, and that the number thereof was sufficient that if they had voted and had cast their vote for the next highest candidate the result of the election would have been changed.

(Syllabus by the Court.)

*Error from District Court, Wagoner County;*
*R. C. Allen, Judge.*

Action by A. L. Snyder against Harrie Blake.   Judgment for defendant, and plaintiff brings error.   Affirmed.

*A. A. Davidson* and *Robert F. Blair,* for plaintiff in error.

*Joseph S. Dickey, Jr.,* for defendant in error.

HAYES, J. This is an action in the nature of a *quo warranto,* brought by plaintiff in error in the court below to try the title to the office of clerk of the district court of Wagoner county, and grows out of the general election held in that county on November 8, 1910, for the purpose of electing state and county officers.

Plaintiff in error, who will hereinafter be referred to as plaintiff, was elected to the office of clerk of the district court of Wagoner county on September 17, 1907, and thereafter duly qualified and took charge of said office, by reason of which facts he was entitled to hold same until the second Monday in January, 1911, and until his successor was duly elected and qualified. At the election on November 8, 1910, plaintiff was a candidate as the nominee and candidate of the Republican party to succeed himself, and defendant was, as candidate and nominee of the Democratic party for said office, plaintiff's competitor. At that election, as shown by the returns duly canvassed by the election board of the county, a total of 1,675 votes were cast for all candidates for said office, of which number 937 were cast for defendant and 738 for plaintiff, or a majority of 199 in favor of defendant. By reason thereof, there was issued to defendant a certificate of election, and he thereafter qualified and took possession of the office. Plaintiff now seeks to oust defendant from the office and to obtain possession thereof upon the ground that the election of 1910 as to said office was void and should be set aside on account of fraud and misconduct on the part of the election officers or some of them, in said county, and of other persons set forth in his amended petition. Plaintiff does not contend that he received a sufficient number of votes at said election, or would have received a sufficient number of votes in the absence of the alleged fraud and misconduct on the part of some of said election officers to have elected him to said office, but alleges in his petition that a sufficient number of qualified voters were deprived by the wrongful misconduct of the election officers of the right to vote to render the result of said election doubtful and the real choice of the people of a candidate for said office impossible of determination.

In his petition in the lower court, plaintiff alleges in detail and at much length the various fraudulent acts and misconduct of the election officers which he claims invalidate the election. We shall, however, state only the general substance of those allegations. He alleges that prior to the election of 1910 Wagoner county was divided into 25 voting precincts; that no change or alteration had been made in such precincts prior to that election, but that at that election polls were opened in only 21 places in the county; that at five of such precincts the polling places were not at the usual and established places for holding elections in such precincts; that the voters of two precincts were required to vote at one place, which was not the established polling place of either of the theretofore existing precincts. He alleges that in various precincts in the county a large number of negro voters were present on ,the election day for the purpose of presenting themselves to the election officers of the various precincts to vote and remained there for such purpose all day; that only a few of such voters at each place were permitted to and did enter the polling places for the purpose of qualifying as voters; that at such places such proposed voters were subjected to a pretended examination which occupied the whole of said day; that other voters in large numbers present had no opportunity to present themselves to the election officers and prove their qualifications to vote; that in some precincts persons who established their qualifications to vote were by the election officers arbitrarily refused the right to do so and were prevented from voting. The number of voters he alleges to have been deprived of the privilege of voting by these acts of the officers is in excess of a number sufficient to have changed the result of the election, had they been permitted to vote, and all of them had cast their votes for plaintiff.

Defendant in his answer alleges that, if the voters were deprived of the privilege of voting at said election by the election officers, it was done without defendant's knowledge or consent, and that the same was done by the election officers in an honest and faithful effort to discharge the duties of their offices, and that their action was free from any fraud whatever. He further

alleges that there was a conspiracy between the central commit-
tee of the Republican party of the county of which plaintiff was
the nominee, and the political friends and adherents of plaintiff,
to defeat defendant by inducing persons who were not qualified
voters to vote at said election; and that in furtherance of said
conspiracy they had caused threats to be made and sent to the
election inspectors · throughout the county, threatening such offi-
cers with prosecution if they enforced certain provisions of the
election laws of this state, to be found in section 4a, art. 3, of
the Constitution; and that many negroes, in furtherance of this
conspiracy, who were not entitled to vote, crowded about the
polling places on the day of the election, demanding the privilege
to vote, creating confusion and hindering and obstructing the
election officers; and that, because of such confusion and acts
of alleged illegal voters, the election officers were hindered and
delayed in the conducting of said election.

The cause was tried to the court without a jury. The trial
court made a general finding in favor of defendant, and also
found specifically as to certain issues of fact presented by the
pleadings. He found that the alleged changes in the election pre-
cincts complained of by plaintiff had been regularly made by the
county election board after due notice thereof had been posted
throughout the county. He found "that the persons offering or
attempting to offer themselves to vote at the different polling
places throughout the county were fair and honestly dealt with
by the election officers; and the action of said officers was free
from fraud or oppression, except as to about 30 or 40 persons
who offered themselves to vote; and the evidence does not show
whether or not said 40 persons were legal voters." He also
found that "the allegations of plaintiff's petition charging con-
spiracy and fraud are not sustained by the evidence." Upon the
general finding and these special findings, a judgment was ren-
dered for defendant.

Counsel for plaintiff has set out in his brief *in totidem verbis*
the thirteen assignments of error alleged in his petition in error,
but he does not in his brief separately set forth and number
the specifications of error complained of and argument and cita-

tion of authorities in support of each point relied upon in the same order as required by rule 25 (20 Okla. xii, 95 Pac. viii) of this court. An enforcement of this rule would require an affirmance of the judgment of the trial court, or a dismissal of this appeal without any consideration of the case upon the merits; but, from the argument in the brief, it can be gathered that plaintiff's complaint here is that the finding of the trial court exonerating the election officers from any conspiracy or fraudulent acts by which any one was prevented from voting is not sustained by the evidence.

The conduct of the election officers complained of pertains to the manner in which they enforced or attempted to enforce the provisions of section 4a, art. 3, of the Constitution. That section reads as follows:

"No person shall be registered as an elector of this state, or be allowed to vote in any election herein, unless he be able to read and write any section of the Constitution of the state of Oklahoma; but no person who was, on January 1, 1866, or at any time prior thereto entitled to vote under any form of government, or who, at that time, resided in some foreign nation, and no lineal descendant of such person shall be denied the right to register and vote because of his inability to so read and write sections of such Constitution. Precinct election inspectors having. in charge the registration of electors shall enforce the provisions of this section at the time of registration, provided registration be required. Should registration be dispensed with, the provisions of this section shall be enforced by the precinct election officers when electors apply for ballots to vote."

Under the foregoing provision, no person who was not on January 1, 1866, or at any time prior thereto, entitled to vote under any form of government, or who did not at that time reside in some foreign nation, or who was not a lineal descendant of such person, was entitled to vote at the election, unless he was able to read and write any section of the Constitution. There is evidence on the part of plaintiff tending to establish that in several of the election precincts in Wagoner county at the election involved herein the precinct election officers, when any negro offered himself as a voter to vote at said election, he was examined by the election officers, touching his qualifications under

the foregoing provision of the Constitution; and that the examination of each such person who offered himself to vote was prolonged a great and unnecessary length of time by the election officers, ranging from 30 minutes to two hours; and that, pending the time such examination was being made touching the qualifications of such voter, no other negro voter was admitted to the election room to offer to qualify himself as a voter, and as a result of this practice many such persons who were present on the day of the election for the purpose of voting were prevented from offering proof as to their qualifications to vote and were prevented from voting. The evidence on behalf of defendant, on the other hand, as to some of the precincts involved, contradicts the evidence of plaintiff that such conduct was indulged in by the election officers, and the finding of the trial court as to such precincts is conclusive upon this court. There are, however, certain precincts as to which it does not seem to us that the evidence of defendant substantially conflicts with the evidence of plaintiff to the effect that the foregoing practice of the election officers was followed.

When any person who was not entitled to vote under any form of government on the 1st day of January, 1866, and who did not at that time reside in some foreign nation and was not a lineal descendant of such person, presented himself as a qualified voter and asked the privilege of voting, the precinct officers were authorized to require such person to read and write a section of the Constitution before permitting him to vote. *Ex parte Show,* 4 Okla. Cr. 416, 113 Pac. 1062.

But when such proposed voter read intelligibly and wrote legibly the section of the Constitution designated by the election officers, he demonstrated his qualifications to vote, and acts on the part of the election officers requiring him to write at great length many provisions of the Constitution, or detaining him for any great length of time under a pretense of examination, and thereby delaying other persons from entering the polls, was without authority of law.

A large number of persons, variously estimated from 250 to 400, mostly negroes, congregated at the polling place at Vans

Lake on election day. Many of them came for the purpose of voting. Some of them offered to qualify as voters, but were refused permission to do so, because the election officers were engaged at the time in examining other persons as to their qualifications. One person, who had been a teacher in the public schools and had taught 30 years, was admitted to the booth and questioned concerning his qualifications to vote; and, upon being required to read and write a section of the Constitution, he read seven or eight pages of the Constitution and was then given a tablet and pencil to write. One of the officers read slowly to him from the Constitution, and the proposed voter wrote as he was dictated to until he had written some 21 pages. After he had been detained in the booth for two hours and fifteen minutes, he was held by the election officers not qualified and was denied the privilege of voting. Another person who had been principal of a school for five years made application to vote; and, upon its being determined that he would be required to read and write a section of the Constitution, he read a section of the Constitution, and thereupon proceeded to write dictations made to him by one of the election officers, and was detained in the booth for an hour and 30 minutes, during most of which time he was employed in writing, and at the end thereof, was pronounced disqualified to vote. Practically the entire day at this precinct was consumed by the election officers in the examination of eight persons, and the other persons at the polls who desired to offer to vote and be examined touching their qualifications therefor were denied the opportunity to do so. At another precinct no negro was permitted to vote unless he could immediately memorize a section of the Constitution selected and read to him by the election inspector and write the same from memory. At this precinct there were 40 persons present for the purpose of qualifying themselves to vote under the foregoing provision of the Constitution. Of this number, 37 could read and write; but under the rule adopted by the board requiring such proposed voters to memorize immediately any section of the Constitution read to them and to write the same, none was able to qualify, and all were denied the privilege of voting. The conduct of the

election officers at these precincts can find no justification in the law, and their protest that they acted in good faith is refuted by their conduct.

But, under our views of this case, it is not material whether the conduct of the election officers was actuated by a fraudulent purpose or pursued in good faith under a mistaken interpretation of the law as to the duties it imposed upon them. The vital question in the case is whether by such conduct a sufficient number of qualified voters were deprived of the right to vote that, if they had all voted and cast their votes for plaintiff, the result of the election would have been changed.

In *Martin v. McGarr*, 27 Okla. 653, 117 Pac. 323, 38 L. R. A. (N. S.) 1007, this court held:

"An election is void where qualified electors are corruptly and fraudulently deprived of an opportunity to register and vote sufficient in number, had all been counted for the next highest candidate, to have changed the result of the election'.'

The question in that case was presented upon a demurrer to a petition which alleged that, at a certain election in the city of Muskogee by reason of various fraudulent and corrupt acts of the election officials who conducted the election, a sufficient number of qualified voters were deprived of the right to vote to change the result of the election, and that by reason thereof the election was void. The question directly under consideration in that case was whether the denial of a sufficient number of qualified voters of the right to vote at any election in numbers sufficient to change the result of the election, if they had been permitted to vote, and had all cast their votes for the candidate receiving the smaller vote, operated to render the entire election void, or to render void only the vote in the precincts where such irregularities occurred. Whether the effect would be different when denial of such right was the result of fraud and misconduct of the election officers from its effect when the injuries were the result of a misinterpretation of the law or mistakes made by the election officers attempting in good faith to enforce the law, was not considered.

In McCrary on Elections, par. 527, it is said:

Snyder v. Blake.

"The fact that the right to register or to vote has been denied to any person or persons duly qualified to vote may always be shown in a case of contested election, whether such denial was fraudulent or not. The effect upon the rights of electors and upon the result of the election is the same whether such denial be the result of intentional wrong on the part of the officers of the election, or of accident, or an honest mistake as to the law. And if the number of voters whose rights have thus been denied is large enough to materially affect the result, such denial will vitiate the election."

Although we think, as to some of the precincts, the general finding of the court that there was no fraud or misconduct on the part of the election officers cannot be sustained, this error cannot be material or result prejudicially to plaintiff, unless the evidence establishes that as a result of such conduct qualified voters who attended the polls on election day for the purpose of voting, and who would have voted but for such conduct of the officers, in a great number, sufficient to have changed the result of the election, were prevented from voting. While there is much evidence to the effect that there was a large number of persons about the polls in some of the precincts on election day who did not vote and who probably were deterred from offering to vote because of the procedure adopted by the election board, there is an entire absence of any evidence, except as to between 50 and 60 of such persons, that they were qualified electors. But if these 50 or 60 persons had not by the irregular conduct of the election officers been prevented from offering to vote or from voting, and they had all cast their votes for plaintiff, the result of the election would not have been changed. It is admitted in the record that at these precincts, where the irregularities occurred and at the other precincts of the county in which no irregularities were established, 1,675 persons cast their votes, whose qualifications to vote are not questioned. It is a rule of law adopted by almost all of the courts that the entire vote of an election or of a precinct will not be rejected, where it is possible to ascertain and eliminate the fraudulent vote. 15 Cyc. 372. Irregularities and misconduct in conducting an election do not vitiate the election, unless the irregularities or misconduct are in violation of mandatory provisions of the statute, or such in

themselves as to change the result or render it impossible to ascertain the result of the election. *Williamson v. Musick,* 60, W. Va. 59, 53 S. E. 706; *O'Laughlin v. City of Kirkwood et al.,* 107 Mo. App. 302, 81 S. W. 512.

If the influence of the fraud, corrupt practice, or irregularities upon the result of the election can be shown with reasonable certainty, the courts require that to be done, and the votes affected thereby are rejected and the result of the election determined by the unaffected votes legally cast. It is not sufficient to vitiate an entire election that fraud or irregularities have been committed; it must be shown that such fraud or irregularities deprived some one of the right to vote who was qualified to do so, or so changed the vote cast that it did not express the uncorrupted and free choice of the voter. Irregularities or fraudulent conduct on the part of the election officers, that may have prevented or deterred persons who were not qualified to vote from offering to vote and from voting, do not, however reprehensible such conduct is, affect the result of the election. Under the rule announced in *Martin v. McGarr, supra,* a legal voter qualified to vote at the place where he offers to vote, but who is prevented from doing so by the fraudulent, corrupt, or mistaken conduct of the election officers, may have his vote counted for the purpose of ascertaining whether, if he had voted, the result of the election might have been different and therefrom it be determined that the result of such irregularities was to throw such doubt about the result of the election as to render the election void; but a vote of a person who is not qualified to vote can be counted and considered for no purpose. The presumptions are in favor of the validity of the election, and the burden is upon plaintiff who questions its validity to show facts sufficient to destroy it.

As to what consideration will be given in election contests and *quo warranto* proceedings to votes illegally rejected, the authorities are not in harmony, where not controlled by statutory or constitutional provisions. By some it is held that, upon its being shown for whom the rejected votes would have been cast, if they had not been illegally rejected, they shall then be counted

for such candidate. Others hold, as held by this court in *Martin v. McGarr, supra,* that it is sufficient to show that votes of qualified electors have been illegally rejected, and they can then be considered as if they had been cast for the candidate having the next highest in number as shown by the returns; and, if the rejected votes be sufficient to change the result of the election, then the election will be declared void for uncertainty. The former of these rules is established and prevails in the federal House of Representatives. In *Frost v. Metcalfe,* 1 Ellsworth's Election Cas. 289, it was held that, in order to authorize rejected votes to be counted, it was necessary to establish: First, the person offering to vote must have been a legal voter at the place where he offered to vote; second, he must have offered to vote; third, it must have been rejected; and, fourth, it must be shown for whom he·offered to vote. The requirement that the burden is upon plaintiff to prove the qualifications of the voter whose vote is rejected is not an impossible or unreasonable burden; it is a fact easily susceptible of proof, and can, as a rule, be established by the evidence of the person who has been prevented from voting.

Since plaintiff has failed to establish that a sufficient number of qualified electors were prevented by the misconduct and irregularities of the election officers from voting to have changed the result, had they been permitted to vote and had voted for him, the judgment of the trial court refusing to declare the election void should be affirmed.

TURNER, C. J., and KANE and DUNN, JJ., concur; WILLIAMS, J., concurs in the conclusion.