Richard TAYLOR, Wayne White, Chester Phillips and Donald Strother, as a Committee Acting for the Moral Action League, Plaintiffs-Appellees,

v.

Jay ARMENTROUT, Martha Brockwell, Marion B. McKenney, Ben O'Dell and Bill Durham, as Washington County Election Commissioners, Defendants-Appellants.

Supreme Court of Tennessee, at Knoxville.

Dec. 30, 1981.

108

Charles T. Herndon, IV, Johnson City, for defendants-appellants; Herndon, Coleman, Brading & McKee, Johnson City, of counsel.

Lodge Evans, Elizabethton, for plaintiffs-appellees.

## OPINION

DROWOTA, Justice.

The object of this lawsuit was to have declared void a "liquor by the drink" or "on-premises consumption" referendum which took place in Johnson City on November 4, 1980. The referendum was on the ballot along with other local questions and the general election which took place on that date. The question was on ballots and voting machines only at polling places set up for voters who lived within the city. Because it was a city question, it was not put on ballots and machines at polling places used by those who resided in the two counties in which Johnson City is located, but not in the city proper. The Chancellor rejected many of the arguments of those

who challenged the results of the referendum below, and the argument regarding joinder of those who in turn appealed to have the results upheld. With those holdings we agree.

However, the Chancellor voided the referendum, wherein there were 6,646 votes in favor of liquor by the drink and 6,640 votes against. We feel that the Chancellor was in error in so doing, and we therefore reverse his holding.

The Chancellor's opinion well describes the background of this controversy. Several areas had been annexed to Johnson City in recent years before the election, including some five or six areas within one year prior thereto. The voting precincts involved were Cherokee, Asbury, Midway, Barnes and Princeton. These precincts contained voters who were annexed and thus were to become city or "inside" voters. They also continued to contain voters who remained county residents and thus were entitled to vote only in county or "outside" elections. In all but the last-mentioned precinct, separate voting places were set up for "inside" and "outside" voters. That is, each location became two legally separate voting places. As to Princeton, this remained wholly an "outside" precinct. Former Princeton voters who were in annexed areas were to vote thereafter at the Town Acres precinct, which was wholly an "inside" precinct.

Additional facts will be discussed below, but on election day there remained some voters who had been annexed but were not shown as such on the County Election Commissioner's voter registration lists. The lists continued to show these as "outside" voters. When the city liquor referendum carried by only a 6-vote margin, those who opposed the referendum brought this action claiming that these voters had been "prevented" from voting in the referendum; that the election officials at the polling places mentioned above had "refused" to

allow these voters to vote on the city questions on the ballots; and that these voters had been "entitled" to vote inside. The plaintiffs are officers of an organization named the Moral Action League; they did not allege that they personally had been prevented from voting on the question. They alleged that there were enough individuals who would have voted against the question, but were "denied" the right to vote, to have changed the outcome. Thus, they sought alternative relief. The relevant alternatives were: (1) that the vote be recounted to exclude a few illegally cast votes and to include those who were "denied" the opportunity to vote but who would have voted against the question, so that the results of the election would be to defeat the question; or (2) that the election be held to have been permeated with such illegality and irregularity that a free expression of the will of the voters did not appear, that the outcome was altogether uncertain, and that the vote be held void in its entirety.

With respect to the dispute over the annexees, the Election Commission, defending the validity of the results, argued that it had more than met any statutory requirements. The Commissioners argued further that voters have a corresponding duty to "follow up"—to see that they are properly registered and to actively assert their right to vote, or they will in effect be estopped to dispute, after the fact, the validity of an election in which they did not vote.[1]

In our opinion, the vote on the liquor referendum was valid. We do not find evidence in the record to support the proposition that as many as six voters were *improperly* denied the right to vote inside the city. This opinion is based upon a construction of the language of several sections of our Code, and we find that the Chancellor relied in his holding upon certain sections which are totally irrelevant to this issue. Those which he relied upon are:

1. We disagree with the conclusion of the dissent that this argument was not properly raised. Counsel for the Commission discussed at length before the Chancellor the contention that this duty exists, and the Chancellor acknowledged the argument in his opinion but did not concede that it was valid. The argument was made to this Court as the last of the seven issues raised in the Commission's brief.

1. TCA § 2–2–102, which provides that a qualified voter is any United States citizen, at least eighteen years old, who has been a resident of Tennessee for at least twenty days prior to registering, unless he is disqualified under other Code provisions.

2. TCA § 2–2–105, which provides that registration is permanent unless it is purged under the Code. A registered voter does not have to *reregister.*

3. TCA § 2–2–104, which sets out who may register permanently. (There is no assertion in this action that any of the annexees were not qualified to be registered or were not in fact registered to vote.)

4. TCA § 2–2–106, which requires a voter to be purged from registration if, inter alia, he moves his residence outside the voting precinct in which he is registered unless he has *transferred* his registration.

5. TCA § 6–51–102, which provides that when territory is annexed, its residents shall immediately be entitled to all rights and privileges of citizenship in the municipality.

6. TCA § 6–53–102, which provides that everyone who has been a resident of a municipality for three months before "said" election (except at first election) and who is qualified to vote for members of the general assembly, may vote in municipal elections. (The word "said" refers the reader to § 6–53–101, which by its terms applies to elections for mayor, aldermen, and other officers of a municipality.)

From the foregoing, the Chancellor derived his holding that once the annexees had registered (as they all had), their registration was permanent and they were not required to "reregister" when they were annexed. Without having to do anything, they automatically became qualified to vote "inside" and thus to vote on the liquor referendum.

■ We hold that this is not a question of "reregistration." It is crystal clear, from the Code and the testimony at the hearing, that precinct lines were changed each time territory was annexed to Johnson City. Without changing their residences, all annexed voters nevertheless were "moved" within the contemplation of the law to a new polling place. Since there is no specific statutory scheme covering such a legal "move" from an "outside" to an "inside" precinct, we should apply the statutory schemes which govern the consequences of a change, by the County Election Commission, of precinct boundaries; and the consequences of a physical move by a voter of his residence, from one precinct to another. In both instances, what takes place is properly referred to as a *transfer* of registration, which is entirely different from the *reregistration* spoken of by the Chancellor.

Code sections relating to transfer of registration when a voter physically moves his residence are:

1. TCA § 2–2–129, setting out a procedure to be followed for transfer of registration when the voter moves outside the precinct *in which he is registered.*

2. TCA § 2–2–107, requiring that a person shall be registered as a voter of the *precinct in which he is a resident.*

3. TCA § 2–2–108, setting out when the Election Commission shall be open in order for voters to register, replace lost registration cards, transfer or change their registration, etc.

4. TCA § 2–2–109, providing that a qualified voter may register *or* have his registration altered whenever the Commission office is open *except* during the 29 days before an election established by statute.

5. TCA § 2–2–106, providing that registration *shall* be purged if a person moves outside the precinct *in which he is registered unless he has transferred his registration.* The purge shall take place as soon as the Commission knows of this ground. The Commission shall mail notice of the purge within ten days.

The proper procedure to be followed when the Election Commission changes the boundaries of a precinct is found in TCA § 2–3–101 et seq. Section 2–3–102 first provides that the Commission may change precinct boundaries when required by law. A change within ninety days of an election

shall not be effective for that election. Section 2–3–105 requires that when boundaries are altered, the Commission shall publish the changed boundaries *and* mail to each affected voter a notice of his new polling place and precinct number. Section 2–3–106 requires that the boundaries shall be described either by metes and bounds or by a map. Maps shall be recorded and available for public inspection.

The Code incorrectly assumes that "each affected voter" can be identified by the Commission and will thus receive personal notice of a change in precinct boundaries. The difficulty of the statutory procedure arises when, as occurred here, the Commission has no way of knowing whether or not a given voter is affected by the change. Each of the voters who testified was registered at a route number, not a street address. There is simply no statute which governs this situation, and thus the Commission is called upon to exercise discretion once it has met its initial burden. It thus becomes necessary to recount what the Commission undertook to do in order to fulfill its statutory duty.

The Chancellor observed that the Commission's efforts were "Herculean." There were numerous separate annexations involved, several being within a year before the election. The Commission published every change of precinct boundaries in the newspaper. Each notice included a request to each voter who did not receive personal notice and a new registration card through the mail, that such voter individually contact the Commission. It sent the personal notices to everyone who it could determine was affected. In making such determination, it did the following: It telephoned people to ask whether they had been annexed or knew of anyone who had been missed. It checked lists of city water connections, census records and the City Directory. In addition to the investigation and notification performed by the Commission, the *City* sent policemen from door to door with information packets for each annexed household. Within each packet was a para-

graph instructing voters to let the Commission know of their entitlement to vote in City elections.

It should be added that in the election which took place in August, 1980, the Commission again attempted to identify annexees not previously identified. At that election, whenever a voter asserted his right to vote "inside," he was allowed to do so. The Commission's records were then corrected. This is significant because several of the voters who testified herein had voted "outside" not only in the August election but also in several previous elections, even though they knew that they had been annexed. These voters had not only constructive knowledge, but also actual knowledge, that their registrations were incorrect. They had never, as common sense would dictate, pointed out the error to the registrars or asked that a correction be made, despite one or more opportunities to do so.

■ The above Code sections make it clear that a voter's precinct is an integral part of his registration. This conclusion is inescapable based upon the foregoing Code sections, and this Court has so held, *State v. Weaver*, 122 Tenn. 198, 122 S.W. 465 (1909).

The voter must register in the civil district, ward, or voting precinct where he offers to vote. This clearly appears from a consideration of all the provisions of the statutes, and such has been their practical construction. [The Code] require[d] the registrars of each district, or voting precinct, to appear at the place where the election is held with the books in which the voters are numbered, which are made evidence of registration, and occupy places inside the polling precincts, and check off or mark said voters as each voter therein registered shall vote. The voter's name cannot appear upon these books unless he has there registered.[2] No other registration books are required or authorized to be present or used, and a registration in another precinct would not avail the voter anything.... The regis-

**2.** *See* present Code §§ 2–2–126, 2–7–112, 2–7– 115, 2–7–124(1).

tration must be in the district or ward where the vote is proposed to be cast. 122 Tenn. at 206, 122 S.W. 465.

It has also long been the law in Tennessee that the registration laws do not prescribe additional qualifications for voters, so complying with the foregoing statutes could not in itself disenfranchise a voter. This Court in *Moore v. Sharp*, 98 Tenn. 491, 498, 41 S.W. 587 (1897) construed Code sections which required any registered voter who moved either within or without the ward or district where he was registered, to transfer his registration at least twenty days before an election wherein he wished to vote; and which separately required that the registration books be closed twenty days before an election. Ten persons moved their residences less than twenty days before the election in question, and the trial court had held that such persons lost their right to vote. This Court affirmed such ruling, holding that the Legislature could reasonably regulate the exercise of the right to vote, in such a manner.

> . . . [I]t has sometimes been claimed that the statute requiring voters to be registered before the day of election and *excluding from the right* all whose names do not appear upon the list, was unconstitutional and void as adding another test to the qualifications of voters which the Constitution has prescribed, and as having the effect, where voters are not registered to exclude from voting persons who have an *absolute right to that franchise* by the fundamental law. This position, however, has not been accepted as sound by the Courts. The provision for a registry *deprives no one of his right*, but is only a reasonable regulation under which the right may be exercised.

98 Tenn. at 498–499, 41 S.W. 587 (emphasis added). Two useful purposes of such law were: (1) To enable election officers to " 'proceed with more deliberation in the discharge of their duties and to avoid the haste and confusion that must attend the determination upon election day of the various and sometimes difficult questions concerning the right of individuals to exercise

this important franchise' "; and (2) to allow electors to ascertain in advance who claims the right to vote, to determine whether the claim is well founded, and to decide to challenge any registered voter as being unqualified. *Id.* at 498, 41 S.W. 587.

In *State v. Weaver*, 122 Tenn. 198, 122 S.W. 465 (1909), an individual was indicted for voting without having registered twenty days before the election. Again, Weaver argued that the registration law in effect prescribed an additional qualification for voting and thus disenfranchised him. Again, this Court held that the registration law merely regulated the exercise of the franchise, serving to identify those qualified to vote. Again it was pointed out that the problem of ascertaining whether a voter was qualified should not be left to the "pressure and excitement" of election day.

> "Requiring a party to be registered is not in any true sense imposing an additional qualification, *any more than requiring a voter to go to a specific place for the purpose of voting, or requiring him to prove by his own oath or the oaths of other parties his right to vote when challenged . . . .*"

122 Tenn. at 202–203, 122 S.W. 465 (emphasis added).

We hold that for this election, the Election Commission went far beyond that which was required of it by statute in providing notice of changes in precinct boundaries. We further hold that one purpose of the statute is to put affected voters on constructive notice of such changes. Indeed, since TCA § 2-3-105 lists publication as the *first* of the two methods of providing notice of changed boundaries, one could easily infer that the Legislature regarded such publication as the *primary* form of notification. When the Commission has complied with the statutes, affected voters should be charged with a duty to inquire of the Commission about their status if they do not receive personal notice. They have an implied duty to ascertain that they are correctly on the records and entitled to vote. See TCA § 2-2-131, which provides that the Commission may correct any errors in

registration records which are apparent on the face of the records or which are called to its attention by the voter whose record is incorrect.[3]

██ We are not ignoring the fact that the statute places the initial or primary burden of providing notice upon the Commission. However, since the statute does not expressly govern all situations, but does provide in effect for constructive notice to affected voters, we hold that the burden of "following through" shifts to the voter. Once the Commission has provided all possible notice, both actual and constructive, the Commission and the election officials at each precinct on election day should be entitled to rely upon the registration lists as they exist on that day. The precinct officials have no other means of determining who may vote at that precinct, and there is a strong public policy in favor of preventing fraudulent voting and insuring the purity of the ballot box. *State v. Weaver, supra; Moore v. Sharp, supra.*

Having determined that the registration books as they stood on election day were presumed to be correct, the second issue to be discussed is how voters who *had* been missed should have been dealt with when they arrived at the polls to vote. The actual conduct of elections, so far as is pertinent here, is governed by the following Code sections:

1. TCA § 2–7–112(a) sets out the procedure for preparing to vote. If an applicant at the polls *appears ineligible* to vote, the registrar shall tell the applicant that he is *not eligible.* If the applicant *still claims that he is eligible*, the registrar shall challenge him and act on the decision of the judges.

2. TCA § 2–7–102 requires that the judges decide challenges to voters.

3. TCA § 2–7–123 provides that if anyone's right to vote is challenged by another person at the polls, the judges shall present the challenge to the person and decide the challenge. The voter must take an oath.

4. TCA § 2–7–124 provides that one of the grounds on which a would-be voter may properly be challenged is that he is not a registered voter *at the polling place.* It will be recalled that, in our opinion, a voter's polling place is an integral part of his proper registration. The judges may ask any question. If the voter *claims to be registered* but there is no *duplicate record of him at the voting place*, they are to check the original permanent records with the registrar-at-large.

5. TCA § 2–7–125 governs what happens when the judges have decided the challenge.

██ The key section is § 2–7–112(a). The clear import thereof is that if a voter is challenged on the ground that he is not a registered voter at that polling place, and the voter does not protest and assert that he is qualified to vote there, he is bound by the challenge *even if the officials are incorrect.* If a voter really wants to vote, he must say so at the time, when his rights can still be protected, rather than after the votes are counted. There are strong public policy reasons for the Legislature's drafting the Election Code in this way. For example, public policy favors upholding the validity of an election whenever possible, unless there is the clearest evidence that the results should be voided. Requiring voters to assert their rights before the fact, when mistakes are simple to rectify and disruption is minimal, promotes certainty of results and saves much needless expense. If a few individuals can cause an election to be voided when they allege too late that they were illegally denied the right to vote, this would lead to the disenfranchisement

---

3. *See also* TCA § 2–7–106, which supports the conclusion that the voter has a duty *whether or not he is actually aware of same.* This section provides that if there is no election official at the polling place, the Commission shall promptly appoint new officials. Until the polling place opens, any voter who is eligible to vote there may vote at the office of the Commission, and such ballots shall be counted by the Commission. If no one is at the polling place who can inform him of this right, he could only learn of it by exercising his own initiative and inquiring at the Commission.

of others who did make an effort to vote and, for some good reason, might be unable to vote in a second election. We believe that our statutory scheme strikes a proper balance between the interest of the individual in preserving his right to vote, and the interests of the public in validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense.

Cases from other jurisdictions support this view. Four such cases will be discussed here. In *Erwin v. Benton*, 120 Ky. 536, 87 S.W. 291 (1905), a municipality held a liquor referendum which appeared to pass by two votes. The contest board voided the election. (Since alcoholic beverages could be sold at the time in that town, the effect of voiding the election was to allow liquor to continue to be sold.) On appeal, the lower court held that the referendum had indeed passed by two votes. Among the alleged irregularities was that three voters "were refused the right to vote, at least they were challenged and failed to vote." 87 S.W. at 294. The Kentucky court held that

> [u]ntil the voter either qualifies by showing his right to vote, or offers to do so by making the affidavit required by law, he is not a rejected voter. The officers of election, if honestly in doubt concerning his right to vote, may properly demand that he comply with the law so as to protect the ballot, by the safeguards provided by the statute, from illegal voting. The conditions provided are reasonable, and, until complied with, neither the voter nor any other can justly complain that he was not allowed to vote.

*Id.*

In *Martin v. McGarr*, 27 Okl. 653, 117 P. 323 (1911), the incumbent mayor of Muskogee (Martin) brought action to have the election of his successor voided. He was not one of the candidates. McGarr had been declared winner by fourteen votes. Martin alleged that the election officials had engaged in deliberate fraud and corruption; that more than fourteen voters had presented themselves to vote and were denied ballots; and that thus it could not be determined what the true results would

have been, so that the election must be voided. The court's holdings on two of Martin's grounds disclose the philosophy that the voters have duties and responsibilities. One of these grounds was that the county election board had not recognized certain city ward boundaries, so that 400 voters in the affected territory were disenfranchised. The court held it irrelevant whether or not the election board had acted correctly, because the voters had a remedy which they could have pursued before the election. The statute provided that if the board failed to act as directed, any voter could apply for a writ of mandamus. Thus, "having failed to act when he could have done so, and when his action would have produced no result but good, he cannot now be heard to speak on this subject, when to hear him might result in nullifying the votes of all qualified electors which were cast and which would bring no affirmative relief to those who were denied the right to vote." *Id.*, 117 P. at 325.

The second of Martin's grounds bearing upon the voter's responsibility concerned the fact that at two precincts, there were fifty voters present but there were no supplies and the polls never opened. It was asserted that these electors were denied the right to vote. However, the court observed that the election board had all necessary supplies. If the voters had been "diligent," they could have voted. Besides, the statute set up a procedure designed to circumvent this difficulty. Thus, the statute provided a remedy, which "should have been pursued by the electors, instead of negligently allowing the time and opportunity to pass when they might have voted, and it would be unjust to set the entire election aside because of their failure." *Id.* Every voter has the burden of fulfilling the requirements of the law, " 'and he is presumed to know the law and to go to the polls and comply with its conditions.' . . . [I]f the voters were disfranchised, they were, by their own omissions, voluntary parties to their disfranchisement, and such action on their part ought not to result in the disfranchisement of all of the other qualified electors who cast their ballots." *Id.*, 117 P. at 325–326.

The third case to be mentioned is *Pennington v. Hare*, 60 Minn. 146, 62 N.W. 116 (1895). Therein, two candidates were opponents for alderman, and the loser contested. The winner asserted that he should have had twelve additional votes, because twelve qualified voters went to the polls to vote for him,

> but by an *erroneous decision of the judges* they were not permitted to vote; that they were not prevented from voting by fraud or intimidation. If these electors had been prevented from voting by fraud or violence, it might and probably would have been the duty of the court to have rejected the entire vote of the precinct, or declared the election void, as justice might require. [This was not the issue here; plaintiffs had not sought this remedy.] ... It seems a hardship that an elector should lose his vote by reason of an error of the election judges, but errors of judgment are inevitable; and, whenever any possible remedy which can be suggested is inconsistent with the highest public interests, they are remediless.

62 N.W. at 117 (emphasis added). The court was clearly saying that if a voter is prevented from voting because of a well-intentioned decision of the election officials, even if that decision is wrong, he has lost his vote. The candidate who had originally been declared winner was held to have been elected by a one-vote margin.

A recent case decided in Kentucky is *Kirk v. Harmon*, 557 S.W.2d 220 (Ky.App.1977). The Kentucky statutes provide that when any precinct boundaries are changed, placing a registered voter in a different precinct, his registration shall be transferred to the proper precinct and he shall be mailed notice thereof. KRS § 116.085, formerly § 117.645. What takes place is similar to the procedure called for in TCA § 2–3–105.

Kirk and Harmon were opponents for a local office. Harmon was declared winner by four votes, and Kirk brought action seeking either that she be declared winner or that the election be declared unfair and void. The Kentucky court held as follows:

Four persons testified that they went to the polls on election day but were refused the right to vote because their names were not included on the list of voters for that precinct. These persons had been erroneously registered in another precinct because of clerical errors in registration process. All four persons could have voted in the precinct in which they wanted to, had they visited the County Clerk's Office on the date of the election and requested and received authorization from the election commission which was impanelled and present that date for the purpose of handling such occurrences. All four persons testified that they would have voted for Kirk.

Kirk argues that because these voters were denied the right to vote, Section 6 of the Kentucky Constitution, which provides that all elections be "free and equal", was violated and therefore the election should be void.

. . . . .

Kirk does not allege any fraud, intimidation, bribery or violence in the conduct of the election but rather alleges that because these four persons were not allowed to vote, the election should be set aside. In the instant case, however, these persons could have voted had they obtained authorization and certification from the election commission at the County Clerk's Office. There were no transgressions amounting to disfranchising any persons, but rather clerical errors in the registration process which the voter, had he wished to, could have corrected and thereafter cast his vote.

There is no evidence in the record that a single person was unlawfully deprived of the right to cast a vote for the candidate of his choice. There is no evidence which would authorize this court to deprive Harmon of the office to which she was elected.

*Id.* at 221.

Because *Kirk* is so recent and shows such a close parallel not only to the facts before us, but also to our statutory scheme, we find that it is highly persuasive in favor of

the validity of the outcome of the referendum in this case.

In light of our view of the law, it becomes necessary to review the testimony of the voters who the Chancellor held were illegally denied the right to vote, and of the election officials involved. This review will be organized by precinct.

### I. Barnes precinct.

Ruth Carr stated that she had voted "outside" in August and had contacted "the Commission in Johnson City" thereafter. She had been told that she would be sent a new "inside" registration card "when they got it worked up." Lana Bowman, County Registrar, stated that there was *no* Commission office in Johnson City (the county seat is Jonesboro), so that Mrs. Carr had *not* reached the Commission. When she went to vote in November, she was told that they had her name at the "outside" polling place at Barnes, and that she would have to vote there. There is no testimony that she protested, although she certainly knew that she was supposed to be "inside." Therefore, there is no ground for voiding the election here.

An official at Barnes stated that she knew of no voter who was denied the right to vote "inside" by virtue of not having been transferred from the "outside" books.

### II. Asbury precinct.

■ Ken Gaskin stated that he had voted "outside" in August. He went to the "inside" precinct in November but was told to vote "outside." There is no testimony that he protested this ruling. Also, he had received the correspondence from the City upon being annexed. (This correspondence expressly instructed him to contact the Commission regarding his entitlement to vote in City elections.)

A registrar at this precinct stated that she had told several people to vote "outside" when they appeared in the "inside" line. She did not know about anyone calling the Election Commission. Probably more than six voters were affected. There was no question or testimony about wheth-

er any voters protested and whether such voters would have voted in the referendum.

Based upon the vagueness of this testimony and lack of evidence of protest, there is no evidence of events at this precinct that would justify voiding the election.

### III. Princeton precinct.

■ This was entirely an "outside" precinct. Annexees from this area were to vote thereafter at Town Acres. Eight Princeton voters testified: Betty Jo Taylor, Judy and Shelby Greene, Ethel Reece, R. J. Krouse, James and Janice Light and Mrs. Walter Vanhoy. All of these voters stated that they first learned that the liquor referendum was not on the ballot when they went into the machines. Yet four voters had been annexed for about four years and one voter for nine years, and thus had voted previously in elections wherein they knew that "city" questions were not on their ballot. Of the three who had been annexed for approximately a year, two had voted at this precinct rather than Town Acres in the August election. (The third was not asked about such election.) One of the eight had actual knowledge before election day that her polling place could be wrong. One voter had voted at Town Acres the first year after annexation, but had then been switched back to Princeton. She knew that all of her neighbors voted at Town Acres. Another voter had known that the Commission was sending out new registration cards to annexees, but had not contacted the Commission when he did not receive one. Not a single one of these voters made a request to vote on the referendum or took any other steps on election day. Even after the election, only one voter had transferred his registration, and he had done so on the day of the hearing. In our opinion, the results of the election could not be changed based upon these witnesses' testimony.

No election official from Princeton testified.

### IV. Cherokee precinct.

■ Seven Cherokee voters testified that they were not allowed to vote. Five of

these simply testified that they voted "outside" when told to do so because they were not on the "inside" books. One voter specifically remembered receiving the information packet from the city, but had failed to read it. She also knew neighbors who had received new registration cards, while she had not. There is no evidence here to justify voiding the election.

Mr. and Mrs. Roy Tipton present a different situation. They went together to vote and were told to vote in the "outside" precinct. He testified that he then asked (one would infer on behalf of himself and his wife), "Well, can you give me a piece of paper that would show that I'm registered and let me vote in the city?" This is indication that the Tiptons went farther than anyone else who did not ultimately vote, in asserting their desire to vote (although they did not contact the Commission or otherwise protest; in fact, Mr. Tipton was ill and anxious to go home). Since there is evidence that the Tiptons fulfilled the duty which the Code imposes upon voters, we shall assume arguendo that two uncertain votes have been unearthed.

Two officials from this precinct testified: Valda Reed and Lindola Chisam. Their testimony indicated that "several," perhaps ten or twelve, were told to vote "outside." The precinct tried to reach the Election Commission for a ruling on how to handle such voters. They received a ruling at about lunchtime (some phones were out of order until then) that they should allow annexees to vote specially on the referendum, and have them sign an oath that they lived "inside." The list thus compiled was to be used after the election to change the registration books. The Commission made the same ruling as to all of the precincts. Mrs. Chisam named three affected individuals whom she specifically recalled. One of these was a Rita Barrett, who actually went to the Commission on her own and was allowed to vote. The other two were the Presnells, who also testified. Mrs. Reed knew that five or six persons who had come in before they received the Commission's ruling, returned later and voted specially. She did not personally know which voters

might have been contacted. We cannot make any conclusion, based on these officials' testimony, that the referendum results have been made incurably uncertain. Of those who did not come in later and cast a special vote, there is no indication, first, that they desired to vote on the referendum; second that they made any protest; and, third, that they were not among the voters who testified (as the Presnells were).

V. Midway precinct.

■ One allegedly disenfranchised voter from this precinct testified, Oscar Leach. He had voted in the morning and had not been allowed to vote "inside." At one point, he said that he had learned some two hours later that his wife *had* been allowed to vote "inside." Elsewhere, he said that he did not find out until it was "too late" for him to go back and vote. There is no indication of how forcefully he attempted to vote; but, in contrast to his wife, who strongly protested, he did not do so to the point where the Commission was asked to make a ruling.

The official in charge at Midway stated that "very few" annexed voters were affected. Some of these said only that they "thought" they lived inside. She told the voters, " 'If you want to vote in the city, either try to call them [the Commission] or go down.' So they said it didn't make any difference."

There is no ground for voiding the election based upon events at the Midway precinct.

We also consider important the testimony of Lana Bowman, the County Registrar. She testified that the Commission began receiving calls from the precincts due to the annexation problem *from the beginning of the morning*, and calls continued all day. (The precinct was supposed to call with regard to each voter because it was necessary to determine whether or not he was registered at all.) No one who went so far as to ask to vote specially on the referendum was refused. Twenty-three paper ballots were cast in the referendum, and she

matched these against the individuals about whom calls had been made from the precincts. Many of the persons who her records showed belonged "inside" in fact voted "inside." The Chancellor named three individuals who her list showed should have been "inside" but voted "outside." However, again, there is no showing that these persons desired to vote in the referendum or made a protest. (One would infer that they did *not* protest since those who did, according to Lana Bowman, were all allowed to vote.)

To illustrate the point that some voters do carry out their duty of going forward, we would mention the case of Patsy B. Leach (whose husband testified above that he did not get to vote inside.) Mrs. Leach stated that when she was told to vote "outside," she made such a protest that one of the officials (at Midway precinct) called the Commission and obtained permission for her to vote if she would sign a piece of paper. Also we note the case of Rita Barrett, a voter at Cherokee. An election official testified that she took it upon herself to go directly to the Commission and was allowed to vote. This was confirmed by Lana Bowman, the Registrar.

In sum, we find evidence that only two voters, Mr. and Mrs. Roy Tipton, specifically asked if there was a way for them to vote and were still directed to vote "outside." The existence of two uncertain votes, when the referendum passed by six votes, does not justify voiding the entire election and disenfranchising all who *did* vote. This is especially true where over 1,600 persons voted in the General Election that day, but not in the referendum; these persons, who could have voted in the referendum but did not do so, were in effect making a statement that *either* result would be acceptable to them.

█ Further comment must be made about three voters who actually lived "outside" but were mistakenly on the books as "inside" voters. Their votes on the referendum were thus illegal, but do not provide

grounds for voiding the election. When specific votes are known to be illegal, as here, but the entire election process was not permeated with fraud and illegality, the illegal votes are merely subtracted from the totals in the manner prescribed by the case law: If it is known how the person voted, the vote can be subtracted from that total. If it is not known how he voted, the rule in Tennessee is that a fraction of his vote is subtracted from each total according to that total's relationship to the entire number of votes. *Moore v. Sharp*, 98 Tenn. 491, 501–503, 41 S.W. 587 (1897). *See also Martin v. McGarr*, 27 Okl. 653, 117 P. 323 (1911).

Here, two of the illegal voters, a husband and wife, testified that their votes were opposite on the referendum. Thus, we can substract one vote from each total without changing the six-vote margin. It was not known how the third elector voted, so roughly ½ vote would be subtracted from each total.[4] Still the margin would essentially be unchanged.

█ We cannot accept the idea that, because the initial duty of transferring voters to new precincts is borne by the Commission, the voter is forever relieved of any further obligations. Many of these voters had participated in one or more elections after being annexed, knowing that each old precinct had become two separate precincts, and knowing that they were still carried in the books of the "outside" precinct. Such voters should not be permitted to rely in this case upon not having received personal communication from the Commission of a change in precinct. It does not appear to us that a voter should be protected by the notification requirement beyond the first election in which he votes after being annexed.

It should be emphasized that on election day, the precinct officials and the Commission were faced with a dilemma which they had had no reason to anticipate. They had to resolve this dilemma without any specific instructions from the statutes. They had

---

4. .4998 vote would be subtracted from the total vote against the question and .5002 vote from the total vote in favor. *Moore v. Sharp, supra,* 98 Tenn. at 502, 41 S.W. 587.

no choice but to use their discretionary powers to devise a solution which would strike a balance between the import of the statutes and the rights of the voters. First, there can be no doubt that annexation *does* require the creation of new and different precincts. Annexed individuals *do not* remain legal voters at their former polling places. As shown above, a voter may only vote where he resides and where he is registered, but these voters were not registered where they resided. For 29 days before the election, the registration books are closed, so in reality none of these voters could have had his registration transferred to an "inside" precinct during that entire time, let alone on election day itself. Under TCA § 2–7–115(a), if a registered voter has moved outside the precinct where he is registered within 90 days before an election, he may still vote in the polling place where he is registered. All of the voters who testified had been in their new precincts for over 90 days by the time of the November 4, 1980, election; but, assuming arguendo that they were not bound by the 90-day limit since they had not physically moved, these voters still would not have been helped by having the right to vote in their former precincts: the liquor referendum was not on the ballot in such precincts.

It can readily be seen that the Commission needed time to work out a solution and in effect it "bent" the law in order to allow these persons, who were legally neither fish nor fowl, to vote. The officials took no more time than was reasonable in arriving at the best possible solution, which was to have the voter sign a list and vote on a paper ballot at the "inside" precinct and *only* on the city issues (not on the general election, because he would thus be voting twice on the general election candidates). The fact that some voters did not get to vote during this time is not illegal disenfranchisement and provides no ground to void an entire election simply because later on, other annexees *did* get to vote.

 We therefore hold the election valid, subtracting approximately 1.5 votes from each total because of the 3 illegal votes which were shown. Since all of the evidence in the case revealed only two voters who may have persisted and were still denied the opportunity to vote specially, we hold that the election was not rendered incurably uncertain and that the referendum indeed passed by a valid, although narrow, margin.

Our holding is based upon the Legislature's public policy expressed as a theme running through the Election Code, and upon the longstanding case law. One facet of this policy is to decline to void elections wherever possible, and certainly when the validity thereof is attacked on the basis of after-the-fact grumblings by persons who took no positive action before the fact. The public policy of upholding elections is served by requiring voters to assert the right to vote at the time such right is challenged, so that corrective action can be taken and statutory procedure followed. This also serves to protect the right of the individual. Further, it is a practical and workable solution to the problem created by the fact that one can only vote in the precinct where he resides *and* is registered, but these voters legally resided in new precincts where they did not appear on the registration books despite the best efforts of the County Election Commission.

We therefore reverse the holding of the Chancellor and declare the "on-premises consumption" referendum of November 4, 1980, valid. The cause is remanded to the Chancery Court of Washington County for such further orders or proceedings as may be necessary. The costs of this appeal shall be taxed to the appellee.

Reversed and remanded.

HARBISON, C. J., and FONES, J., concur.

BROCK and COOPER, JJ., dissent in a separate opinion.

BROCK, Justice, dissenting.

On November 4, 1980, a referendum election was conducted in Johnson City to determine whether the sale of liquor by the drink should be permitted in the city. The

certified result of the election was: 6,646 votes in favor of the sale of liquor by the drink, 6,640 votes opposed to the sale of liquor by the drink. The dry forces brought this action contesting the election and contending that it was void because at least 18 registered voters who were qualified to vote in the referendum attempted to vote therein but were denied that right by the polling officials because the names of these voters did not appear upon poll lists which the Election Commission had furnished to the polling officials as representing those eligible to vote in the referendum. The case was tried before the Chancellor who declared the election to be void. The Washington County Election Commission appealed to this Court.

As found by the Chancellor, it is well established in the record that at least 18 registered voters who were fully qualified to vote in this referendum election appeared at the polls and attempted to vote in the referendum but were rejected because their names did not appear upon the poll lists furnished by the Election Commission to the polling officials purporting to list the persons entitled to vote in the referendum. I cannot accept the argument of the majority opinion that these rejected voters lost their right to vote because of their supposed "failure to protest" as provided by the second paragraph of T.C.A., § 2–7–112(a). First, there is no showing that the polling place officials explained and pointed out to these qualified voters what, if anything, they were required to do, under the circumstances, to be enabled to vote. Clearly it was the duty of the polling place officials to make such explanation to these rejected voters; these were the officials who were holding the election. Secondly, the argument that these voters lost their right to vote by their "failure to protest" is one which was not made in the trial court or in this Court.

Since the number of legal votes thus rejected (18) exceeded the margin of victory (6), the result of the election is rendered incurably uncertain under the rule that applies in such situations. *Lanier v. Revell*, Tenn., 605 S.W.2d 821 (1980); *Emery v.*

*Robertson County Election Commission*, Tenn., 586 S.W.2d 103 (1979); *Maloney v. Collier*, 112 Tenn. 78, 83 S.W.Rptr. 667 (1904).

Conceding that 18 voters were denied their right to vote in this referendum election, the Election Commission argues that the voters were rejected, not because of fraud or any other improper conduct on its part, but, solely because of accident and inadvertence which it tried mightily to avoid. Indeed, the Chancellor found that the Election Commission had exerted "Herculean efforts" to assure to every qualified voter the right to vote in the referendum.

We have held, however, that proof of actual fraud is not required to void an election. *Emery v. Robertson County Election Commission, supra.* It is generally held that an election is void if enough persons were unlawfully deprived of the opportunity to vote, or if enough legal votes were thrown out, to change the result; but, the election will not be vitiated by exclusion of lawful votes if such exclusion could not have changed the result. *Maloney v. Collier, supra; Kempen v. Bruns*, Tex.Civ.App., 195 S.W. 643 (1917); *Carville v. McBride*, 45 Nev. 305, 202 P. 802 (1922); *Mayberry v. Gaddis*, 88 Okl. 286, 213 P. 316 (1923); 29 C.J.S. *Elections* § 211 (1965); 26 Am.Jur.2d *Elections* § 278 (1966). If it appears that the number of legally qualified voters who were prevented from voting, or whose votes were rejected by reason of fraud, bribery, mistake, negligence or erroneous decision of the election officers, is so great that it might have changed the result of the election if such voters had been allowed to cast their votes and have them counted, the election should be declared void. *Callison v. Peeples*, 102 S.C. 256, 86 S.E. 635 (1915). Corruption or fraud is not necessary where enough voters to change the result have been disfranchised. *Coggeshall v. Des Moines*, 138 Iowa 730, 117 N.W. 309 (1908); *Marsden v. Troy*, Tex.Civ.App., 189 S.W. 960 (1916).

I, therefore, conclude that the Chancellor was correct in holding that the election was void because of the rejection of at least 18 duly registered and qualified voters, there-

by rendering the outcome of the balloting incurably uncertain. There is no escaping this result although it does appear that the rejection of these voters was the result of mistake in failing to recognize them as bona fide residents of the city of Johnson City and, thus, qualified to vote in the referendum.

There is no merit in the insistence of the defendant Election Commission that the complaint should have been dismissed because the Chancellor permitted the plaintiffs to amend the complaint more than ten days after the election by adding as a necessary party defendant the Carter County Election Commission. There is no reversible error in such action even if we consider that the Carter County Election Commission was an indispensable party.[1] Rule 21, T.R.C.P., provides that parties may be added on such terms as are just and that misjoinder is not a ground for dismissal. Moreover, in *Austin v. Mayfield*, Tenn., 611 S.W.2d 824 (1981) we held that the trial court had erred in not allowing an amendment filed more than ten days after the election.

I would affirm the decree of the Chancellor and remand this cause to the trial court for further appropriate proceedings. I am authorized to state that my brother, COOPER, joins in this dissenting opinion.

## OPINION ON PETITION TO REHEAR

DROWOTA, Justice.

The contestants of the election have petitioned for a rehearing in this cause, and in response we file this addendum to the foregoing opinion.

### I.

One of contestants' principal points in their petition is that this Court's holding adds another qualification to the right to vote—the duty of a citizen to keep abreast of his registration and to communicate his desire to vote in one particular precinct as opposed to another precinct. They rely upon several cases decided by the United States Supreme Court. We have thoroughly studied these cases, as well as conducted independent research, and hold that such cases are not analogous to or dispositive of the case at bar. In *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1975), Texas statutes carved out a group of people, military personnel stationed in Texas, and provided that so long as they were in the military they could not register to vote. In *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Virginia Constitution required payment of a poll tax as a prerequisite to voting, thus preventing an identifiable group from voting, on the basis of their wealth. In *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), Ohio statutes made it practically impossible for a new political party, or an old but small party, or an independent candidate, to get on the ballot in Presidential and Vice-Presidential elections. In *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), otherwise qualified voters were prohibited by New York statutes from voting for school board members, unless they owned or leased property or had children attending the public schools. In *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), Louisiana statutes prohibited people who did not pay property taxes from voting on the issuance of municipal utility revenue bonds. In *Evans v. Cornman*, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), Maryland statute prohibited residents of a federal compound within the state from registering to vote. In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the former Tennessee election code required bona fide residents of the state (and county) to fulfill a durational residency requirement as a prerequisite to registering.

In all of these cases, the state has taken systematic, conclusive action, before the fact, which resulted in a complete deprivation of groups of citizens of the right to

---

1. "... If said municipal corporation includes territory in two (2) or more counties, such election and all other municipal elections of such municipal corporation shall be called and conducted by the county election commission of the county in which said town seat or city hall is located." T.C.A., § 6–53–101.

vote. Such groups were singled out in advance, thus creating classifications which resulted in invidious discrimination. There was nothing which a citizen within the class could do to acquire the right to vote.

The voters who complain in this case are in a drastically different posture from those in the foregoing cases. Neither this Court nor the Tennessee statutes have created any class of otherwise qualified voters who are nevertheless systematically prevented from voting. We have merely construed the law as to (1) what constitutes, in the context of the issues of this case, proper registration to vote and (2) whether or not the conduct of the officials, which was admittedly in good faith and not fraudulent or willful, was proper under all of the circumstances. Indeed, there was no action which denied the vote to any *group* of people. Only a few individuals were affected and took no action on their own behalf.

All of the above Supreme Court cases recognize the rights of the states reasonably to regulate the franchise. *See Oregon v. Mitchell*, 400 U.S. 112, 124–131, 91 S.Ct. 260, 264–268, 27 L.Ed.2d 272 (1970), wherein the Court invalidated the portion of the 1970 Voting Rights Act which lowered the voting age from 21 to 18 in state elections.

## II.

In addition to the above argument, contestants urge us to decide two questions which the Chancellor specifically refrained from deciding. Because of the length of time which has already passed since the referendum, and in order to avoid additional delays, confusion and uncertainty about the outcome of the referendum, we shall deal with contestants' other two grounds for arguing that the referendum failed or is void.

A. Contestants claim that the referendum has to pass by a majority of the 14,942 votes cast in the general election rather than a majority of the 13,286 votes cast in the referendum itself. The referendum, held under TCA § 57–4–103, was conducted according to the provisions of § 57–3–106. That section, in turn, requires that such referendum pass "by a majority vote at an election held as hereinafter provided." It is express within both §§ 57–4–103 and 57–3–106 that the "election" referred to is the local option election, regardless of what other questions may share the ballot. Such interpretation comports with the case law of this, as well as other, jurisdictions.[1] This issue is entirely without merit.

B. Contestants also make a constitutional objection to TCA §§ 57–4–103 and 57–3–106, arguing that they "discriminate against small municipalities"[2] in violation of Art. 11, § 8 of the Tennessee Constitution. This section, of course, generally prohibits legislation for the benefit of any individual(s).

On the other hand, too many cases to cite hold that the Legislature may reasonably create classifications; if such classifications are not arbitrary, they are constitutional.

Contestants do not explain how they would claim to have standing to argue that these statutes discriminate against "small municipalities," since they are certainly not members of a class discriminated against.

In any case, we hold that the statutes are constitutional. Contestants cite to us two cases in support of their proposition: *Frost v. City of Chattanooga*, 488 S.W.2d 370 (Tenn.1972) and *Pirtle v. City of Jackson*, 560 S.W.2d 400 (Tenn.1977). These cases are not dispositive. For one thing, they

1. Cf. *State v. City of Miami Beach*, 257 So.2d 25 (Fla.1971); *State ex rel. Cashmore v. Anderson*, 160 Mont. 175, 500 P.2d 921 (1972); *Derryberry v. State Bd. of Election Comm'rs*, 150 Tenn. 525, 266 S.W. 102 (1924).

2. Section 57–4–103 makes that chapter effective in (a) counties with over 60,000 people, (b) municipalities with over 110,000 people, (c) municipalities with over 20,000 people which are in a county with over 60,000 people, (d) municipalities with over 28,000 people located in 2 or more counties, with 55% or more of their property owned by the federal government. What is authorized under that chapter, in proper cases, is selling alcoholic beverages for consumption on the premises of hotels, restaurants, commercial airlines and passenger trains, premier type tourist resorts, clubs, convention centers, historic performing arts centers, and permanent facilities at urban park centers.

deal with a different section of the Constitution, Art. 11, § 9, which provides in part that "[t]he General Assembly shall by general law provide the exclusive methods by which municipalities may be created, merged, consolidated and dissolved and by which municipal boundaries may be altered." Such section is therefore more restrictive than that relied upon herein. As we recognized in *Frost, supra*, classifications may be made in many instances, but Art. 11, § 9 specifically requires that laws relating to alteration of municipal boundaries be general. Although we did not go so far as to hold that the Legislature may not alter municipal boundaries by an act valid under the classification doctrine, yet the Court could not conceive of any case in which the same would be valid.

Similarly, in *Pirtle, supra*, cities of a certain size and those with a metropolitan government were exempted from a statutory requirement that they be able to demonstrate the reasonableness of annexation ordinances. No one was able to suggest to this Court, nor did any occur to us, a rational basis for the exemption. Therefore, it was arbitrary and unreasonable.

We hold that the Legislature could have had a reasonable justification for including only certain counties and municipalities within TCA § 57–4–103. Perhaps it was considered that entities within those classifications were more likely to attract travelers, business people, tourists, and others going to the listed types of establishments for recreational and entertainment purposes than entities of smaller populations. It is also suggested that the administrative burdens occasioned by governmental regulations of the liquor industry are more easily borne by entities with larger populations. We note that under § 57–3–101 et seq., entities with small populations may qualify for the privilege of selling alcohol at package stores.

Since we are able to conceive of valid reasons for the classifications set up in § 57–4–103, and since contestants have asserted no reason why the classifications should be held unjust, arbitrary and invalid, we hold that such section is constitutional under Art. 11, § 8 of our Constitution.

We therefore state again that we reverse the holding of the Chancellor and we further reject the contestants' additional arguments concerning the majority of votes cast, and the constitutionality of the referendum statute. The contestants have made known their intention to petition in the United States Supreme Court for a writ of certiorari and as alternative relief seek a stay of judgment and mandate. TRAP 42(c). We therefore stay the mandate for thirty days pending the filing of such a petition, and thereafter until the Supreme Court rules on the petition.

Justices Brock and Cooper adhere to the views expressed in their original dissenting opinion. As to the majority of votes cast issue and the constitutionality of the referendum statute issue, they concur with the majority.

HARBISON, C. J., and FONES, J., concur.

BROCK and COOPER, JJ., dissent in part and concur in part.